UNITED STATES of America, Appellee,

v.

James W. BARRETT,
Defendant, Appellant.

No. 84–1744.

United States Court of Appeals,
First Circuit.

Argued April 1, 1985.

Decided June 21, 1985.

Rehearing En Banc Denied
July 23, 1985.

F. Mark Terison, Asst. U.S. Atty., Portland, Me., with whom Richard S. Cohen, U.S. Atty., Portland, Me., was on brief for appellee.

Before COFFIN, Circuit Judge, ALDRICH and ROSENN,* Senior Circuit Judges.

COFFIN, Circuit Judge.

Appellant James Barrett challenges his conviction for armed bank robbery in violation of 18 U.S.C. § 2113. He contends, principally, that: (1) the evidence was insufficient to support the verdict; (2) the district court ruled erroneously on several evidentiary matters; (3) the court improperly refused to instruct the jury as to the defense theory of the case; and (4) for these and several other reasons he should be granted a new trial. Having considered all the grounds raised by Barrett, we find that none of them, either alone or in combination, gives sufficient cause to overturn his conviction.

### I. *Facts*

The following basic facts were virtually undisputed at trial. At 9:10 a.m. on Saturday morning, October 4, 1975, three armed men wearing ski masks entered the Lunts Corner Branch of the Northeast Bank in Portland, Maine. In a period of less than a minute, they ordered the customers and employees to get down on the floor, grabbed four or five bags of money containing approximately $11,500, and ran out of the bank and into their recently stolen getaway car parked just outside the bank's entrance. As the car careened out of the parking lot of the bank and the adjacent shopping mall, an off-duty police officer gave chase in his private car. By chance, he had seen the robbery in progress while he and his wife were on the opposite side of the bank at its drive-in window. The officer's wife had driven their car away and across the large parking lot to the shopping mall and had gotten out to call for help. The officer had slid behind the wheel and circled the car back toward the front of the bank, and as the getaway car drove away, he pursued. The two cars sped out onto a side street and down it for a short distance until they rounded a bend. The getaway car then slid to a stop on the left-hand shoulder of the road and its occupants came out firing their guns at the officer's still oncoming car. He skidded to a stop and ducked down behind the dashboard because he did not have his service revolver with him to return fire. Although he got one more brief glance at the fleeing robbers, he did not see exactly where they went. As was later discovered, they had run to a second, "clean" getaway car and escaped downtown into Portland.

* Of the Third Circuit, sitting by designation.

With these facts not seriously disputed, the trial focused on the questions of whether Barrett had been one of the three robbers who entered the bank and whether there had been a fourth person, the driver, who had waited outside the bank in the getaway car. The prosecution charged that four individuals had been involved: Barrett, Joseph Aceto, who was the government's key witness, Raymond Levasseur, and Thomas Manning. Aceto testified that Manning had been the driver, waiting in the car, the only one of the four not wearing a mask; Aceto had been the point, or "floor", man entering the bank first and ordering the customers and employees to get down; and Levasseur and Barrett had followed, the former going around, or over, the counter to the left and the latter over it to the right. Both grabbed bags of money, came back over the counter, and retreated with Aceto out the door and into the car.

Barrett's story was markedly different. He claimed that he was not present during the robbery and had nothing to do with its planning or execution. He stated that although Manning had been an acquaintance in 1972 while both were in prison, the two had had no further contact until the end of October 1975, approximately three weeks after the Lunts Corner robbery. At that time, according to Barrett, he had met with Manning and Aceto, been told of that robbery, and been asked to join Manning, Aceto, and Levasseur in the execution of a series of bombings, kidnappings, and other bank robberies. When Barrett refused the offer, Aceto allegedly became very angry and Barrett left, never to see the others again.

Given the wide divergence in these two accounts of what occurred, the trial ultimately turned on the relative credibility of Aceto and Barrett. In the end, the jury believed Aceto's story and found Barrett guilty of armed bank robbery. Thereafter, Barrett filed a motion for acquittal or new trial. In its Memorandum of Decision of June 26, 1984, the district court denied the motion, addressing in detail most of the issues that Barrett now raises on appeal. 598 F.Supp. 469. We shall discuss here only the more substantive challenges.[1]

## II. *Sufficiency of the Evidence*

Barrett's initial claim is that the evidence adduced at trial was insufficient to support his conviction. For Barrett to succeed with this claim, he would have to demonstrate that the evidence "and all the legitimate inferences drawn therefrom, viewed in the light most favorable to the government, were insufficient to demonstrate beyond a reasonable doubt" that he was guilty. *United States v. Smith*, 726 F.2d 852, 866 (1st Cir.1984) (en banc).

Having carefully considered all of the evidence, we find that Barrett has failed to carry his burden and that a rational trier of fact could have found beyond a reasonable doubt that Barrett had been a participant in the Lunts Corner bank robbery and was therefore guilty as charged. While there may have been minor details in Aceto's testimony that did not ring true,[2]

---

1. The appeal involves dozens of issues, some of which the briefs treat lightly and others of which are covered in great detail. We have culled the briefs and record, taking time to consider each issue carefully, but we address only those that we have found to be of significance and present them in an order which, although different from that of either party, permits what we think is the most comprehensible treatment and presentation of the overall appeal. We say this not in criticism of the parties' presentations, but rather to assure the parties that we have thoroughly covered the terrain.

2. For example, it came out on cross-examination that Aceto, after being arrested in 1976, had made a statement to investigators that Manning had seen a gun in the hand of the police officer when his car was stopped by the shopping mall and that the officer had used the gun later when the robbers were firing at his car as they were running to their second car; yet, the officer testified that he had no gun. Even if we assume the officer was unarmed, it would not have been unreasonable for the jury to discount Aceto's earlier statements, first, because they partially concerned the hearsay statements of Manning and what he saw while Aceto was in the bank, and second, because it would not have been difficult for Aceto to have believed the officer was returning fire when Aceto and the others were running in fear and firing several shots at

we are more impressed by the important aspects of his testimony that were corroborated by one or more of the disinterested witnesses who were either in or near the bank during the robbery. Most important is the fact that two of these witnesses, including the one who was closest to the getaway car as the robbers climbed into it, testified that they saw a driver waiting in the car as the three robbers in the bank ran outside. Thus, even though two other witnesses could remember seeing only three robbers in the fleeing getaway car, Aceto's critical testimony regarding the presence of the fourth individual was corroborated.[3] Also, although none of the disinterested witnesses was able to affirmatively testify to having seen two robbers behind the counter at the same time, as Aceto claimed, all of these witnesses saw three robbers inside the bank. In addition, their answers to questions concerning where they saw the various robbers, when considered in conjunction with the six or seven photographs taken during the robbery by the bank's two security cameras, provided at least some support for Aceto's claim that a second robber went over the counter on the right side.

■ As for those aspects of Aceto's testimony which were neither corroborated nor contradicted by disinterested witnesses—the most important being his identification of Barrett as the third robber in the bank—we simply note that there is no federal evidentiary requirement that an accomplice's testimony be corroborated. *See,*

e.g., *Lugo v. Munoz,* 682 F.2d 7, 11 (1st Cir.1982). Unless an accomplice's testimony is "incredible or unsubstantial on its face", *United States v. Dailey,* 759 F.2d 192, 198 (1st Cir.1985) (quoting *Lyda v. United States,* 321 F.2d 788, 794–95 (9th Cir.1963)), which is not the case here, the testimony may be considered by the jury and used to support a conviction if the jury is properly instructed to scrutinize the testimony with great care, *id.* at 200. The trial court so instructed the jury and also gave proper cautionary instructions concerning the plea agreement that Aceto struck with the government in 1976 and the evidence that was adduced regarding his mental status,[4] both of which are discussed below.

### III. *Evidentiary Rulings*

Barrett claims that the district court erred in a number of its critical evidentiary rulings. For convenience we shall consider these in three distinct groups: first, those relating to Aceto's 1976 plea agreement with the government; second, those relating to Aceto's mental status; and third, those relating to Barrett's 1963 shooting of Stephen Poulos.

### A. *Aceto's Plea Agreement*

Defense counsel brought out on cross-examination a number of facts concerning Aceto's criminal convictions and his plea agreement in an effort to show that he was biased toward giving testimony favorable to the government's case. In particular,

---

the officer's car as it slid to a stop. Neither this discrepancy in Aceto's testimony nor the others that are described in Barrett's brief compel a finding that the jury could not reasonably have believed Aceto's basic testimony.

**3.** It is not at all surprising that the several disinterested witnesses disagreed with one another on a few points. The robbers were in the bank for less than a minute and each of the witnesses was able to see only part of what was happening. All of those inside the bank had been ordered to get down and had either closed their eyes for part of the time or had a wall, counter, or some other obstacle that kept them from seeing the whole scene. Those outside the bank, two of whom were driving cars, also had only seconds to make their observations. It

would not be unreasonable in such circumstances for the jury to believe the person who was closest to the car regarding the presence or absence of an unmasked driver waiting in the car.

**4.** While the jury instructions might have been improved by the inclusion of a particular warning with respect to the uncorroborated portions of Aceto's testimony, *see, e.g. United States v. Dailey,* 759 F.2d 192, 200 & n. 8 (1st Cir.1985), the instructions taken as a whole made it unmistakably clear that his testimony was to be "scrutinized thoroughly and considered with great care". Indeed, the court used the phrase "great care" no fewer than six times in admonishing the jury to evaluate his testimony with caution.

Aceto testified that in the mid-1970's he had participated in five bombings, three bank robberies (including the Lunts Corner robbery), three car thefts, and a theft of dynamite. He admitted that he had ultimately been sentenced to time served, or two years and ten months, for his involvement in the bombings and bank robberies, even though he could have legally been sentenced for life. He stated that the minimal sentences were a result of the deal he had struck with the government, by which he agreed to testify against others involved in certain of the crimes in exchange for a promise that the government would recommend to any federal or state court before which Aceto appeared that he be sentenced to prison for substantially less than the maximum legal term. Aceto further stated that under his plea agreement the government had entered him into its Witness Protection Program, under which his identity had been changed, and that he still was the beneficiary of that program's services.[5] Finally, he admitted that in 1980 he had been convicted of five unrelated crimes committed after he was released on parole in 1979 and that he was currently serving a sentence of 13 years for those crimes.

Despite having been able to elicit this and other testimony to attack Aceto's credibility, Barrett contends on appeal that his Sixth Amendment right to cross-examine Aceto was violated by the trial court's refusal to allow Aceto to testify as to those crimes he committed in the mid-1970's which were left unprosecuted and as to a pending murder charge for the 1983 slaying of an inmate at the prison in which Aceto was incarcerated. We consider each of these subjects separately.

1. *The unprosecuted crimes.* Near the end of Aceto's cross-examination, defense counsel attempted to ask him about those of his 1975 and 1976 crimes which had not

been prosecuted. For example, counsel asked whether Aceto had ever been charged for his admitted theft of dynamite in New Hampshire. When the government objected, the court sustained the objection on the twin grounds that the evidence being sought was far more prejudicial than probative and that only crimes of which Aceto had been convicted should be inquired into. Fed.R.Evid. 403 & 608(b). In so ruling, the court found unpersuasive defense counsel's contention that he was making the inquiry only to establish the full scope of the 1976 plea agreement between Aceto and the government.

■ A review of the cases clearly shows that a defendant has a right to cross-examine an accomplice as to the nature of any agreement he has with the government or any expectation or hope that he may have that he will be treated leniently in exchange for his cooperation. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *United States v. Jarabek,* 726 F.2d 889, 902 (1st Cir.1984). This includes the right to cross-examine with respect to unprosecuted crimes. *See, e.g., Burr v. Sullivan,* 618 F.2d 583, 587–88 (9th Cir.1980). However, it is also clear that the court has the discretion to limit cross-examination once the defendant's Sixth Amendment right to establish the potential bias of the accomplice-witness has been satisfied. *See, e.g., United States v. Jarabek,* 726 F.2d at 902; *Greene v. Wainwright,* 634 F.2d 272, 275 (5th Cir.1981). In the circumstances of this case, we find that Barrett's Sixth Amendment right was adequately protected and that defense counsel, through extensive cross-examination, fully established the potential bias of Aceto stemming both from his plea agreement and any hopes of leniency. Little if anything would have been added by admitting testimony as to unpro-

---

5. Indeed, one of the more difficult aspects of the trial for Aceto, the parties, the court, and the security personnel involved, was providing protection for Aceto and keeping his new identity a secret. It was believed that he might be the target of an attack because of his cooperation with the government regarding crimes allegedly committed by Manning and Levasseur, both of whom were still fugitives and considered to be extremely dangerous. As a consequence, the security precautions taken during the trial were as stringent as any previously taken for a trial in Maine.

secuted crimes, such as the theft of dynamite, which were inextricably interwoven with the prosecuted crimes that Aceto had already admitted were a part of the plea agreement. Thus, the cases upon which Barrett relies, *e.g., Burr v. Sullivan,* 618 F.2d at 587–88; *United States v. Crumley,* 565 F.2d 945, 949 (5th Cir.1978), because they involved exclusionary rulings which prevented *any* serious inquiry into the accomplices' expectation of favorable treatment, are inapposite. Much more on point are *United States v. Vasilios,* 598 F.2d 387, 389–90 (5th Cir.1979), and *United States v. Mackin,* 502 F.2d 429, 439 (D.C. Cir.1974), where no abuse of discretion or Sixth Amendment infringement was found in the restriction of cross-examination, because the jurors had before them all the evidence they needed to recognize the vulnerability of the witnesses' testimony. As the brief account above amply demonstrates, the jury in this case was similarly fully apprised of any bias that Aceto might have.

2. *Pending murder charge.* The trial court cut off completely any reference to, or inquiry about, a 1983 murder charge that was pending against Aceto. Defense counsel's claim was that Aceto might expect leniency from the federal government with respect to the state prosecution of this indictment, even though it involved an event which occurred approximately seven years after he struck the 1976 plea agreement with the federal government. After making its initial exclusionary ruling, the court was persuaded to allow defense counsel to call back Aceto, at considerable expense and trouble to the court and government, *see supra* note 3, so that defense counsel could try to establish out of the jury's presence a foundation for the claimed hope of leniency. Defense counsel asked a number of questions which were objected to on the basis of form. The

objections were properly sustained on that basis, but the court also encouraged defense counsel to rephrase his questions and to continue to try to show how his line of inquiry might yield relevant and probative evidence of bias. Defense counsel, however, suddenly gave up and said that he had no further questions. Thereupon, the district court concluded that its earlier exclusionary ruling should stand.

▮ We agree. It is within the discretion of the court to determine whether to allow inquiry into specific instances of conduct, not the subject of a conviction, for the purpose of proving a witness' truthfulness or untruthfulness. Fed.R.Evid. 608(b). There certainly was no abuse of discretion in this instance, for the court gave counsel ample opportunity to make a record from which he could argue that the witness was biased because of a particular hope or expectation, *see, e.g., United States v. Tracey,* 675 F.2d 433, 439 (1st Cir.1982). As the government points out, defense counsel never asked the critical question whether the government had made any agreements with respect to the pending charge or whether Aceto had some hope of leniency with respect thereto. Barrett failed therefore to establish during voir dire any reason why inquiry into this most prejudicial matter should be made before the jury.[6]

### B. *Mental Status of Aceto*

A great deal of information concerning the mental stability of Aceto was admitted into evidence, most of it to impeach his testimony concerning the robbery. It was established, for example, that three times in the distant past he had been institutionalized, primarily because of drug related problems, that he had recently been sufficiently agitated, psychotic, and delusional to be put on a prescription of 600 milli-

---

**6.** Equally unpersuasive is Barrett's more general claim that the court's rulings were so confusing and "chilling" that defense counsel was unable to fully develop the extent of Aceto's bias. The record suggests that any confusion or "chilling" effect that followed the court's rulings resulted not from the actions of the court but from

defense counsel's misinterpretation of those actions. The record also shows, as has already been noted, that the grounds for bias on the part of Aceto were made very clear to the jury. It is difficult to discern, therefore, how Barrett was harmed by any confusion defense counsel may have experienced.

grams of Mellaril per day, and that often those for whom such a dosage is required confuse fact and fantasy. The jury also heard that he had been taking Mellaril up until one or two weeks before the trial.

Despite having been able to introduce this and other damaging evidence concerning Aceto's mental status, Barrett now claims that reversible error was committed by the district court in several of its rulings on this subject. Only two of these claims deserve detailed consideration: first, a claim that Dr. Doe,[7] the therapist who was then treating Aceto, was improperly permitted to invoke a psychotherapist privilege; and second, a claim that the defense was denied the opportunity enjoyed by the government to have an outside psychiatric expert examine Aceto.

■ 1. *Dr. Doe's testimony.* Barrett's basic claim on appeal is that the psychotherapist-patient privilege does not exist under the Federal Rules of Evidence. We need not decide that issue,[8] however, because of the circumstances under which it has been raised. During the trial, defense counsel stated that he believed that such a privilege was generally available and he conducted his limited examination of Dr. Doe, first during voir dire and then before the jury, expressly agreeing that the privi-

lege prevented Dr. Doe from testifying about all confidential matters except those already revealed in a letter that Dr. Doe had recently written and sent to the government.[9] Having taken this position at trial, appellant cannot be permitted to reverse himself at this late date by charging that the psychotherapist-client privilege was not invocable.

■ In addition, we note that, with one minor exception,[10] defense counsel was able to elicit from Dr. Doe everything that he had earlier indicated to the court that he wanted. Dr. Doe's letter was admitted into evidence and Dr. Doe testified that it expressed his professional judgment. In addition, the court allowed defense counsel during the voir dire of Dr. Doe to question him about the effects of Mellaril, as well as about the effects of discontinuing the drug. Defense counsel chose not to ask these questions of Dr. Doe when the jury returned, but did ask them of defense expert Dr. Joseph Brenner, who gave a comprehensive response tending to impeach the testimony of Aceto. Although Barrett argues on appeal, in a very general way, that it was because of the invocation of the privilege that he was unable to obtain Aceto's medical records and ask questions based on them, he ignores the fact that during trial defense counsel expressly

---

**7.** One of the precautions taken to conceal Aceto's new identity was to refer to his therapist as Dr. Doe rather than by his real name.

**8.** Although no federal criminal case has been brought to our attention in which the privilege has been held to allow a therapist to refuse to answer questions concerning the mental status of a witness whose testimony is critical to the prosecution's case, we note that the privilege has been recognized in at least one federal civil case, *In re Zuniga,* 714 F.2d 632, 637 (6th Cir. 1983), and that the privilege has been incorporated into the rules of evidence of several states, including Maine's, Me.R.Evid. 503.

**9.** That letter reads in relevant part:
"[Aceto] has been under my treatment.... He is receiving Mellaril 300 milligrams twice a day in addition to a multivitamin which I prescribed.
In the past he has been extremely agitated, delusional, and psychotic when not on medications. I feel that this medication, which is

in the group of major tranquilizers, serves as an antipsychotic and sedating medication and should help to increase the veracity of his testimony rather than interfere with his testimony."

**10.** During voir dire, Dr. Doe would not say when Aceto had first come to see him. Defense counsel objected that this information lay outside the scope of the psychotherapist-patient privilege, but the court overruled the objection. Assuming for the sake of argument that the objection was valid, we fail to see how Barrett was ultimately prejudiced by the doctor's refusal to answer. The other information elicited during the voir dire examination—that Dr. Doe had started Aceto on a lighter dosage of Mellaril when Aceto first came to see him and that he had increased it to the high level of 600 milligrams per day only three or four weeks before the trial—was more than sufficient to establish that there was some risk of Aceto's testimony being unreliable because of his mental condition.

agreed with the court that there was no need to delve into those records or go beyond the questions concerning Aceto's medication. Thus, even if the psychotherapist-patient privilege were not properly invocable, we do not see how its invocation in this case prejudiced the defendant.[11]

2. *Examination of Aceto by expert witness.* Dr. Doe's letter was received by the prosecutor and a copy handed to defense counsel on the first day of testimony. Unsure of the use to which defense counsel might put the letter, the government decided to enlist the help of an outside psychiatric expert, Dr. Ulrich Jacobsohn, who, if necessary, could be called as a rebuttal witness. Dr. Jacobsohn examined Aceto briefly the next day. Defense counsel, by contrast, appears to have responded much more slowly to the letter, and did not request until the very end of trial that defense expert Dr. Brenner be given permission to examine Aceto and retake the stand to give the results of such examination. By then, Aceto had been called to testify on the second, third, and fourth day of trial, returned to prison, recalled on the sixth day at defense counsel's request, and returned once more to prison; Dr. Doe and Dr. Brenner had already testified and the latter had returned to Boston; and Dr. Jacobsohn was on the stand, the last witness to be called in the trial. At that point, defense counsel's request for an examination was denied as untimely.

■ On appeal, Barrett claims that he was unfairly denied an opportunity to have Dr. Brenner examine Aceto and that the government had an obligation to inform defense counsel earlier in the trial that Dr. Jacobsohn was a potential witness and had examined Aceto. We disagree. In making his claim of denied opportunity to examine Aceto, Barrett ignores the fact that from the moment that Dr. Doe's letter was received the potential advantage in having an outside expert examine Aceto was obvious.[12] Undoubtedly this is why the government enlisted the services of Dr. Jacobsohn to give rebuttal testimony if necessary. A request at that point or at any time prior to Dr. Brenner's taking the stand almost certainly would have been granted. The untimeliness of the request was not the fault of the court or the government, and the court's denial of the request did not constitute an abuse of discretion.

■ As for the second part of Barrett's claim, we agree with the district court's finding that the government had no duty to disclose that Dr. Jacobsohn might be called on rebuttal. There is no general duty to disclose witnesses under Rule 16 of the Federal Rules of Criminal Procedure, and any such duty arising under the government's voluntary agreement to give a list of witnesses extended only to those who were expected to testify in the government's case-in-chief, not to those who might testify on rebuttal. *See, e.g., United States v. Angelini,* 607 F.2d 1305, 1308–09 (9th Cir.1979); *United States v. Windham,* 489 F.2d 1389, 1392 (5th Cir.1974). In addition, we conclude that the government had no obligation to reveal the fact that Dr.

11. The absence of prejudice makes it unnecessary for us to review Barrett's additional two-part claim that Dr. Doe invoked the privilege on his own behalf, rather than on Aceto's, and that Dr. Doe waived the privilege by communicating with the prosecution by letter. We note in passing, nonetheless, that we find both parts of this claim lacking in merit. The record shows that the privilege was invoked on Aceto's behalf, not Dr. Doe's, and that the court and parties proceeded on the assumption that the privilege had been waived only with respect to the medication prescribed for Aceto. The record shows also that the district court did not, as appellant would have us believe, "invite" Dr. Doe to invoke the privilege.

12. If defense counsel did not recognize the importance of this letter until several days after it was received, which is one possibility suggested by the record, no fault can be attributed to the government or the court, for the usefulness of the letter was apparent from even the most superficial reading of its contents. This fact and the fact that the letter was admitted into evidence and commented upon by Drs. Doe, Brenner, and Jacobsohn completely undermines Barrett's further contention that he was somehow prejudiced by the government's not turning the letter over until the first day of testimony. We note, finally, that that was the same day the government received the letter and one day after it was sent by Dr. Doe.

Jacobsohn had examined Aceto or that he had found him to be mentally fit to give testimony. There was no report, scientific test results, or exculpatory evidence to be turned over, as Barrett seems to suggest, and we are unaware of any other grounds upon which such a requirement of disclosure might be based.

### C. *The Death Certificate Issue*

 Barrett argues that the government's impeachment of him through the submission into evidence of a death certificate was so improper as to make the trial constitutionally unfair. The context in which this issue arose is the following.

Very early on direct examination Barrett testified that some twenty years earlier he had killed Stephen Poulos, a person whom he had had occasion to fear. Seeing Poulos coming at him on a street late at night "with a bunch of his friends around him", and reaching into his back pocket for what he thought might be a gun, Barrett "panicked" and shot Poulos, killing him. The first rationale given for eliciting this information, as the court phrased it with the approval of Barrett's counsel, was to establish Barrett's "credibility and explain[ ] the fact that he was previously in prison". A second rationale soon followed. Barrett's counsel explained, elliptically, that "[Barrett's] own experience with the judicial system needs to be understood in the context of the situation where he thought he was totally innocent and would be vindicated."

In short, the reasoning apparently was: (1) I did kill Poulos but it was clearly only in self defense; (2) I was so convinced of my innocence that I made no plea bargain; (3) I was shocked to be convicted—and to remain incarcerated for thirteen years before my counsel rescued me; (4) therefore, when I learned Aceto was naming me as a participant in the Lunts Corner robbery, I went into hiding. Thus, the fact that I hid was not, as the government would have it, a sign of my guilt, but rather a sign of my lack of faith in the justice system.

When Barrett was cross-examined, he acknowledged shooting Poulos three times in the side as he was spinning around. Later, the government offered and the court admitted over objection an authenticated copy of Poulos's death certificate, which reported the cause of death as "Multiple gunshot wounds of back homicide". Barrett's counsel objected to the relevancy of the document, saying that it was beyond the scope of direct examination and that there was a great deal of explanatory testimony at trial. Government counsel offered to submit the transcript of the coroner's testimony at Barrett's trial for Poulos's murder. But Barrett's counsel replied that he would also want the lengthy testimony of eyewitnesses. The court, referring to Federal Rule of Evidence 403, held that the death certificate was admissible, being relevant to an issue opened up by the defense, going to a "very critical issue of credibility", and not causing any unfair prejudice.

At this point Barrett's counsel asked to see the transcript of the coroner's testimony, was allowed to do so, and thereafter renewed his argument, pointing out that the coroner had agreed that the angles of the bullet paths in Poulos's back were consistent with a quick turn by Poulos; that one bullet of four had been retrieved from a doorway in a flattened condition, lending support to the possibility that Poulos, on hearing the first shot, which missed him, made a quick turn; that two brothers saw Poulos, after the shots, lying on his back with his head toward the street; and that there was other testimony suggesting that Poulos was found with a brass weapon in his hand. Government counsel noted the coroner's testimony that one of the wounds was an inch from the midpoint of the back exiting at the navel.

The court, citing Rule 804(b)(1), observed that "The party against whom the testimony is now offered", i.e., the United States, was not a participant in the earlier trial and ultimately ruled it inadmissible, adding that it also involved "an entirely ancillary line of inquiry that would be very time-consuming." The court did, however, allow Barrett to testify that he shot four times (not three as he first testified) while Poulos was

twisting, after first coming straight at Barrett from a recessed doorway, that Poulos fell on his back, with his feet toward the doorway and head toward the street, and that he was holding a brass weapon in one hand.

We observe, first, that Barrett took the initiative on direct examination in making the self-defense point. We may question whether such detail was necessary in order either to explain his being in prison or to make his point that he "was wrongfully incarcerated for 13 years, had no faith in the system, and therefore took to cover when Aceto implicated" him. The simple facts that he was convicted and served 13 years, and that his conviction was finally overturned would seem to serve both purposes sufficiently. Nevertheless, he stressed the details of the shooting and his posture of self defense. The death certificate statement was obviously relevant, though also, equally obviously, prejudicial since it contradicted Barrett. The district court, however, conscientiously did the weighing required by Rule 403; its judgment that any prejudice was not unfair is clearly supportable.

■ As for precluding Barrett from introducing excerpts from the earlier trial transcript, we cannot fault the court on either the ground that the United States had not been a party to the earlier prosecution, as is required under Rule 804(b)(1), or the ground that admission of the transcript would open up an ancillary and time-consuming line of inquiry. Barrett had to know that getting into the details of the shooting—three shots having hit their mark, the victim not having a gun, and at least one shot having entered the midpoint of the back and exited at the navel—invited the very argument as to interpretation that took place. The excluded testimony would by no means have settled the issue. Barrett was given full opportunity to present his story. To have allowed him to put before the jury in the instant case all of the testimony that had been presented to the earlier jury would have been to allow a trial within a trial. Refusal to go this far

did not render the trial "constitutionally unfair".

■ In his post-trial briefs, for the first time, Barrett has relied on Rule 608(b), which proscribes the use of extrinsic evidence to impeach a witness with respect to specific instances of conduct not directly at issue in the trial. Changing grounds on appeal, i.e. substituting a specific rule like Rule 608 for a general rule like Rule 403 as the basis for an evidentiary objection, is not permissible. *United States v. Mennuti,* 679 F.2d 1032, 1036 (2d Cir.1982). Moreover, as is illustrated by all the authorities cited by appellant, the rule is typically involved where the "instances of specific conduct" are first raised by the prosecution during cross-examination, solely for impeachment purposes. *See, e.g., United States v. Ling,* 581 F.2d 1118, 1120–21 (4th Cir.1978); *United States v. Sweeney,* 262 F.2d 272, 277 (3d Cir.1959). Where, however, the specific conduct was introduced and made a material issue by defendant in his direct testimony, proving the falsity of such testimony is a fair target for the prosecution. *See, e.g., United States v. Wright,* 542 F.2d 975, 980 (7th Cir.1976); *United States v. Green,* 648 F.2d 587, 596 n. 12 (9th Cir.1981). For example, if defendant introduces specific conduct as an element of his defense, e.g., entrapment by the government, it is obviously permissible for the government to show in rebuttal that defendant had a readiness to commit the offense by showing prior specific conduct. Thus, even if Barrett had timely raised the Rule 608(b) ground at trial, it would not have been error for the trial court to find it inapplicable under the unusual circumstances of this case.

### IV. *Jury Instructions*

■ Barrett contends that he had a right to have his theory of the case charged to the jury, *United States v. Leach,* 427 F.2d 1107, 1112–13 (1st Cir.1970), and that the district court deprived him of that right by failing to give the following instruction: "If ... you are unable to conclude beyond a reasonable doubt whether 3 or 4 persons

participated in the robbery, you must return a verdict of not guilty." We find, however, that this claim of error is without merit both because it was not properly preserved under Fed.R.Crim.P. 30,[13] and because omission of the instruction, if error at all, was harmless.

What *both* government and defense counsel did after the court completed the jury instructions was to follow a procedure of first making "exceptions" and then making "suggestions". A reading of the record shows that the clear import of this procedure was that the "exceptions" to the charge were meant to be "objections", in the Rule 30 sense of that word, and the less critical and defensible "suggestions" were intended as nothing more than proposals that the parties wanted the court to consider.

In addition, with respect to this particular proposal, the only case referred to during the recorded colloquy was an inapposite Maine decision involving a statutory defense that constituted the defendant's entire case. *State v. Reed*, 459 A.2d 178, 181 (Me.1983). Here, by contrast, the court characterized Barrett's defense as being nothing more than "I didn't do it" or "I wasn't there". Defense counsel did not object to this characterization. Nor could he, for that *was* Barrett's defense. This was not a complicated case and the court's charge to the jury could have left no doubt that Barrett's presence at the bank during the robbery had to be established for him to be found guilty. It is inconceivable that the jury failed to understand this point. We conclude therefore that even if the requested charge as to defendant's theory of the case had been properly demanded, failure to give the charge would have been harmless error, at most.

**13.** Rule 30 reads in relevant part: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider the verdict, stating distinctly the matter to which he objects and the grounds of his objection."

## V. *Miscellaneous Claims*

Barrett's broadest remaining claim is that he should be granted a new trial both because the verdict is against the weight of the evidence and because a combination of prosecutorial misconduct and judicial error denied him his constitutional rights to confrontation and cross-examination of witnesses, to effective assistance of counsel, and to due process. This broad claim, in turn, is based primarily on those specific matters which we have already discussed and disposed of and secondarily on a number of lesser matters, most of which are so lacking in merit that they need not be considered here individually. In fact we need review only two of them briefly.

The first is one of the several examples of prosecutorial misconduct alleged by Barrett. It concerns the March 27 delivery to defense counsel of the so-called "Topsfield Transcripts", the transcripts of a 1976 interrogation of Aceto conducted in Topsfield, Massachusetts, shortly after he was arrested. While it is true that these transcripts were received at the commencement of trial, and not five days earlier, as originally promised, nothing in the record suggests that defense counsel objected to their late delivery at the time or that he was denied adequate time to use them effectively. Indeed during the cross-examination of Aceto the transcripts turned out to be perhaps Barrett's most telling weapon. Absent a showing of prejudice, delay in disclosure provides no ground for reversal.[14] *United States v. Peters*, 732 F.2d 1004, 1009 (1st Cir.1984).

The second matter, the court's limitation of defense to one hour and twenty minutes for summation, is one of the alleged errors which supposedly denied Barrett effective assistance of counsel. Unwilling to repeat the district court's thorough and per-

**14.** So too we find no merit in defense counsel's claim that the need to concentrate on the Topsfield Transcripts kept him from realizing the importance of Dr. Doe's letter. As we noted earlier, even the most superficial reading of the letter should have alerted defense counsel to its importance. *See supra* note 9.

suasive review of this claim in its Memorandum of Decision of June 26, 1984, we are content to summarize its several points. The prosecution was able to complete its summation in about one half hour. The court initially allowed an hour for defense and twice extended the limit. Defense counsel appeared to accept without objection each of these two extensions. Later, seeking a third extension, defense counsel was unable, or refused, to tell the court how much longer was needed. Finally, a review of the summation that defense counsel gave suggests that he had no difficulty in doing an effective job. *See, e.g., United States v. Bednar,* 728 F.2d 1043, 1049 (8th Cir.1984) (no abuse of discretion where defendant was able to fully and fairly present his case). Although he now claims that he was unable to reach one or two points, it is clear that he covered almost everything that he wanted to and that less time spent on other points would have permitted him adequate time to treat both them and the two points he now claims he missed. We hold, therefore, that the court did not abuse its discretion in limiting the time allowed for defense summation.

The remaining individual claims, all of which we have considered carefully, are less meritorious than the two just discussed. So too is Barrett's larger claim that the "interests of justice" require a new trial, Fed.R.Crim.P. 33. While a complete review of the record reveals that security precautions made this trial more difficult than most, the record also shows that the court and the parties did a commendable job in dealing with the difficulty. Whatever minor problems there may have been with the proceedings were totally outweighed by the overall competence and fairness with which it was conducted, by all concerned. Accordingly, we find no cause to grant a new trial.

*The judgment of the district court and its denial of defendant's motion for acquittal or new trial are therefore affirmed.*