UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 96-1462

 UNITED STATES,

 Appellee,

 v.

 MARIA MULINELLI-NAVAS,

 Defendant - Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Jose Antonio Fuste, U.S. District Judge]

 

 Before

 Torruella, Chief Judge,

 Coffin and Campbell, Senior Circuit Judges.

 

 Linda  Backiel, with whom Luis F. Abreu-Elias was on brief for
appellant.
 Maria A. Dominguez, Assistant United States Attorney, with
whom Guillermo Gil, United States Attorney, Jose A. Quiles-
Espinosa, Senior Litigation Counsel, and Nelson Perez-Sosa,
Assistant United States Attorney, were on brief for appellee.

 

 May 23, 1997
 

 AMENDED
 

 TORRUELLA, Chief Judge. On August 9, 1995, Maria

Mulinelli-Navas  ("Mulinel li") was charged with conspiracy to commit

bank fraud, in violation of 18 U.S.C. S 371, making false

statements to a federally insured financial institution, in

violation of 18 U.S.C. S 1014, and bank fraud, in violation of 18

U.S.C. S 1344. On December 21, 1995, a jury returned a guilty

verdict on all counts and she was subsequently sentenced to 27

months for each count, to be served concurrently, and three years

supervised release. Mulinelli appeals only her convictions,

claiming that: (1) the district court's limitation on her cross-

examination  of her accomplices deprived her of her Sixth Amendment

right to confrontation; (2) the district court abused its

discretion by not allowing Mulinelli to introduce extrinsic

evidence to impeach an accomplice; (3) the district court abused

its discretion by admitting into evidence an improperly

authenticated summary chart; and (4) the district court, by

overruling certain objections, deprived her of the ability to

present  her  defense  to  the jury. For the reasons stated herein, we

vacate Mulinelli's conviction and sentence on Counts V and VI and

affirm as to all other issues.

 BACKGROUND

 The  jury  could  have  found the following facts. Mulinelli

was  Senior  Vice President of First Federal Savings Bank, in charge

of  car  loans. Between 1985 and 1988, First Federal approved loans

to two dealers who, in fact, neither bought nor sold the cars for

which the loans were made. Furthermore, these loans involved

 -2-

irregular financing, with low monthly payments and large balloon

payments at the end of one year.

 The indictment charged Mulinelli with conspiring to

approve  fraudulent loans of $25,000 in 1985 and $273,000 from 1987

to 1988 to Lopez, and $130,000 in June 1988 to Exposito.

 At trial, the two auto dealers testified. One of the

auto  dealers, Luis Lopez-Mendoza ("Lopez"), President and owner of

Cordillera  Auto,  testified that he was approached by Mulinelli with

a request that he loan her money. In response to his statement

that he was not in the business of lending money, Mulinelli

suggested  a  financing scheme by which Lopez would apply for a loan

on a non-existent car. According to the loan documents and

disbursement check, the loan was taken out in the name of

Mulinelli's daughter for a Volvo station wagon that was never

actually purchased. They carried out the scheme she described:

upon receiving the loan check, he deposited the amount, then gave

Mulinelli a $25,000 loan from cash on hand at his business.

Mulinelli's daughter testified that she signed for a $25,000 loan

to  purchase  a family car that Mulinelli put in the daughter's name

because  of  credit problems. She testified that the handwriting on

the sales contract "looked like my mother's."

 In 1985, Lopez approached Mulinelli about obtaining

financing of a type not available from First Federal. Mulinelli

suggested a similar scheme, whereby Lopez would execute blank

contracts, stamped with the seal of Cordillera Auto and would

deliver the blank documents to Mulinelli for her approval. Lopez

 -3-

used these loans to finance cars he was purchasing for eventual

resale. A similar strategy was used to provide loans to another

dealer,  Lazaro Exposito Cordoves ("Exposito"), President of Caguas

Auto  Wholesale.   Both  Lopez and Exposito testified that they signed

and sealed blank forms for car sales contracts, which they

delivered to the bank for completion.

 During his testimony, Lopez recanted statements made in

an earlier affidavit, in which he denied that Mulinelli had

knowledge of the fraud. He testified that he lied because the

attorney to whom he made the affidavit told him, before starting

the tape recorder, that the attorney's purpose was to "protect"

Mulinelli. The defense sought to introduce the testimony of the

attorney regarding whether he actually stated that the purpose of

his  meeting  with  Lopez  was to protect Mulinelli. After hearing the

attorney's  proposed testimony out of the presence of the jury, the

trial court upheld the prosecution's objection that his testimony

was extrinsic evidence on a "collateral matter" and thus was

inadmissible.

 Exposito  testified  about  two loans made in 1988 to Caguas

Auto Wholesale, purportedly to finance purchases for a rental

business ("Zoom") that Exposito never established. Exposito

approached Mulinelli and informed her that he needed money. She

told  him  to  bring her contracts and bills of sale for cars that he

would  sell  from his dealership to this sham car rental business so

that she could approve loans for their purchase. For the first

loan,  Mulinelli requested that Exposito provide her with a bill of

 -4-

sale and a loan application reflecting the sale of cars that he

never purchased. Two hours after he delivered the documents to

Mulinelli, the loan was approved and he received a check in the

amount  of  $60,000. Exposito used the funds to buy other cars that

were not pledged as collateral for the loan. He also signed and

sealed blank sales contracts and delivered them directly to

Mulinelli. Exposito testified that Mulinelli knew the cars

referred  to  in  the  two  loan applications were not in Puerto Rico at

the time the loans were made and that he had no intention of

selling the cars to Zoom but rather that he intended to use the

money  to  buy  other cars. Moreover, Mulinelli determined the terms

of  these  loans,  which  included large balloon payments at the end of

the year. In return for her assistance with the loans, he made a

personal  loan to Mulinelli for $5,000 and did some personal favors

for her and her family.

 DISCUSSION

I. The district court's limitation of Mulinelli's cross-
 examination of Lopez and Exposito

 At trial, Mulinelli's counsel cross-examined Lopez

regarding the benefits and conditions of his plea agreement.

Mulinelli  entered into evidence the information by which Lopez was

charged and the plea agreement under which he pled guilty to

conspiracy  to  commit  bank fraud. Mulinelli elicited testimony from

Lopez  that  he was not and would not be charged with bank fraud, in

addition to his conspiracy charge, as Mulinelli had been charged.

Lopez also testified that, as part of his plea bargain agreement,

the United States Attorney would make a recommendation for a

 -5-

reduction in his sentence. The district court, however, cut off

Mulinelli's counsel when on several occasions he tried to elicit

testimony  from  Lopez  regarding the possible sentence he faced. The

district court noted that matters of sentencing were in the sound

discretion of the district court judge who was scheduled to

sentence Lopez.

 Mulinelli elicited similar testimony from Exposito

regarding the substance of the plea agreement -- that he expected

the United States Attorney to make a recommendation for the

district court's consideration in his sentencing, that he was not

charged with bank fraud, but only with conspiracy and making a

false statement to a financial institution, and that he would not

be  charged  with  any  other crimes. Again, the district court barred

Mulinelli from eliciting testimony regarding the nature of the

sentence Exposito expected to receive.

 Mulinelli argues on appeal that the district court's

limitation on her cross-examination regarding the potential

sentence  that  both  accomplices faced before and after entering into

the plea agreements so interfered with her ability to effectively

cross-examine the witnesses that it violated her Sixth Amendment

right to confrontation.

 The Sixth Amendment guarantees that "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be

confronted  with  the  witnesses against him." U.S. Const. amend. VI.

"[T]he right of a defendant in a criminal case to establish the

bias of witnesses against him through cross-examination is an

 -6-

important  component  of  the Sixth Amendment right to confrontation."

United  States  v.  Jarabek , 726 F.2d 889, 902 (1st Cir. 1984) (citing

Davis  v.  Alaska ,  415  U.S. 308, 315-16 (1974)). A defendant has the

right to cross-examine an accomplice regarding the nature of and

benefits, including unprosecuted crimes, afforded under the plea

agreement. United States v. Barrett, 766 F.2d 609, 614 (1st Cir.

1985). Although this right is extensive, it is not absolute or

unlimited.   Once  the  defendant has been afforded the constitutional

minimum of an opportunity for effective cross-examination, the

trial  court  "retain[s]  wide latitude to impose reasonable limits on

such  cross-examination  based on concerns about, among other things,

harassment, prejudice, confusion of the issues, the witness's

safety, or interrogation that is repetitive or only marginally

relevant."   Delaware  v.  V an Arsdall, 475 U.S. 673, 679 (1986). "An

abuse of discretion has occurred only if the jury is left without

'sufficient information concerning formative events to make a

"discriminating appraisal" of a witness's motives and bias.'"

United States v. Twomey, 806 F.2d 1136, 1140 (1st Cir. 1986)

(quoting United States v. Campbell, 426 F.2d 547, 550 (2d Cir.

1970)).

 We find no such abuse here. During direct and cross-

examination  of both Lopez and Exposito, the jury was apprised that

they  were  not  charged  with bank fraud, one of the charges Mulinelli

faced. On cross-examination, Mulinelli was able to elicit

information regarding their plea agreements, including that the

accomplices expected the government to make a beneficial

 -7-

recommendatio n to the sentencing judge based on their cooperation,

and  that  they were granted immunity from prosecution for any other

crimes related to their testimony. The jury could infer from the

circumstances that the accomplices had avoided being charged with

offenses carrying greater sentences by testifying in the

government's case. Mulinelli was able, through her cross-

examination, to expose the biases and motivations of the

accomplices to favor the government and, once this threshold was

met,  the  district court's limitation was not improper. As we find

that  the  jury  had  before  it sufficient information on which to make

a  discriminating appraisal of the accomplices' motives and biases,

we find no abuse of discretion.

 Additionally, Mulinelli's counsel sought to elicit

sentencing  information regarding the charges the accomplices faced

and avoided by pleading guilty to conspiracy. Had Mulinelli

successfully elicited this information, the potential punishment

she  faced,  should the jury find her guilty, would have been before

the  jury.   The actions taken by the district court to prevent this

information,  which could confuse the issues presented to the jury,

from reaching the jury were thus entirely proper. See United

States v. Alvarez, 987 F.2d 77, 82 (1st Cir. 1993) (finding the

district court did not abuse its discretion when it excluded

evidence of the penalty to be imposed on an accomplice as such

information  might  mislead or confuse the jury, "particularly where,

as  here,  the  witness sought to testify to the same penalties faced

by the defendants").

 -8-

II. District court's decision not to allow Jerome Murray to
 testify

 During his cross-examination, Lopez referred to an

interview he had prior to the prosecution of this case with an

attorney named Jerome Murray ("Murray"). Lopez' trial testimony

regarding his interactions with Mulinelli differed from the

responses he had given during his interview with Murray, and he

stated that he lied during that interview because Murray told him

that the purpose of the interview was to "protect" Mulinelli.

Defense counsel stated that he wished to have Murray testify to

impeach  Lopez' testimony that Murray told Lopez that the interview

was intended to "protect" Mulinelli. The trial court refused to

allow Murray to testify.

 Murray's testimony would have gone to the question

whether Lopez was lying about what Murray had said before the

interview,  and  therefore  related to Lopez' credibility. On appeal,

Mulinelli  contends that the district court usurped the jury's role

in making credibility determinations and thereby abused its

discretion.   Although  the use of contradictory testimony is a valid

means of impeachment, it is limited in several important ways.

United  States v. Payne, 102 F.3d 289, 294 (7th Cir. 1996). One of

these  limitations is the collateral issue rule, which bars a party

from  impeaching  a  witness on a collateral matter through the use of

extrinsic  evidence.   Unit ed States v. Beauchamp, 986 F.2d 1, 3 (1st

Cir.  1993)  ("[W]hen  a  witness testifies to a collateral matter, the

examiner 'must take [the] answer,' i.e., the examiner may not

disprove it by extrinsic evidence."). "A matter is considered

 -9-

collateral  if 'the matter itself is not relevant in the litigation

to establish a fact of consequence, i.e., not relevant for a

purpose  other than mere contradiction of the in-court testimony of

the  witness.'" Id. at 4 (quoting 1 McCormack on Evidence S 45, at

169). In other words, "[a] matter is collateral if it could not

have been introduced into evidence for any purpose other than

contradiction. . . . [T]he evidence must have an independent

purpose  and  an independent ground for admission." Payne, 102 F.3d

at 294 (citation and internal quotation marks omitted); see also

United States v. Roulette, 75 F.3d 418, 423 (8th Cir.), cert.

denied ,  117  S.  Ct.  147  (1996). The inquiry into what is collateral

is  squarely  within the trial court's discretion. United States v.

Kozinski, 16 F.3d 795, 806 (7th Cir. 1994).

 In light of the collateral issue rule, in order to be

admissible, Murray's offered testimony must not only contradict a

statement  of  Lopez',  but  must also be material to Mulinelli's guilt

or innocence. Mulinelli fails, however, to indicate any

independent  and  material  ground for admitting Murray's testimony as

to  what  he  told  Lopez  at  the time of the interview. See Payne, 102

F.3d at 295 (noting that defendant's proffer for the purpose of

impeaching  a  witness was collateral, as it did not directly relate

to substantive issues concerning his guilt or innocence, and

therefore was inadmissible); see also United States v. Zuno-Arce,

44 F.3d 1420, 1422-23 (9th Cir.) (where accomplices testifying on

behalf of the government presented contradictory testimony, trial

court  acted  within  its  discretion in determining that "whether they

 -10-

lied, or erred in their perceptions or recollections" were

questions of credibility for the jury), cert. denied, 116 S.

Ct.  383  (1995).   The  district court did not abuse its discretion in

excluding Murray's testimony, which was relevant only to Lopez'

credibility on a matter immaterial to Mulinelli's guilt.

III. Evidentiary rulings

 A. Admission of the summary chart

 The government's first witness was Fernando Iglesias

Iglesias ("Iglesias"), an auditor for First Federal, whose

investigation of First Federal's unusual car loan transactions led

to Mulinelli's indictment. During direct examination, the

government moved to admit a summary chart that Iglesias had

prepared during the course of his investigation, based upon

information  he gleaned from bank loan records. Mulinelli objected

to the admission of the summary chart, arguing that the chart was

not  an  original.   On  appeal, she changes her position, arguing that

the summary chart was not properly qualified under the business

record  hearsay exception. See Fed. R. Evid. 803(6). When a party

raises  on  appeal an argument she failed to present to the district

court, she has forfeited the argument and can only obtain a

favorable  ruling upon a showing of plain error. See United States

v.  Smith ,  101 F.3d 202 (1st Cir. 1996) (explaining that failure to

argue, at time of objection, grounds offered on appeal results in

plain error review), cert. denied, S. Ct. , 1997 WL 106695

(Mar. 31, 1997). Mulinelli must show that the error "resulted in

a miscarriage of justice or seriously affected the fairness,

 -11-

integrity or public reputation of the judicial proceedings."

Coastal  Fuels  of  Puerto  Rico, Inc. v. Caribbean Petroleum Corp., 79

F.3d 182, 189 (1st Cir.) (quotation marks omitted), cert. denied,

117 S. Ct. 294 (1996). The plain error standard affords reversal

"only in 'exceptional cases or under peculiar circumstances to

prevent a clear miscarriage of justice.'" United States v.

Griffin, 818 F.2d 97, 100 (1st Cir. 1987). Mulinelli fails to

indicate any error in the admission of this summary chart "so

shocking that [it] seriously affect[ed] the fundamental fairness

and  basic  integrity of the proceedings below." Id. Moreover, the

summary  chart  probably  have been admissible as a business record as

the  district  court would likely find Iglesias a "qualified person"

within  the  meaning of Federal Rule of Evidence 803(6). We find no

plain error.

 B. Admission of copy of a check

 During the testimony of Iglesias, the government

introduced into evidence a microform copy of a check disbursing

loan  funds  to Mulinelli's daughter. Mulinelli objected "only [to]

the  issue  of  authenticity," Trial Transcript, Dec. 18, 1995, at 81,

of the copy of the check. On appeal, Mulinelli argues that the

admission  of  the microform copy was an abuse of discretion because

the  government should have introduced the original and because the

check was not properly authenticated.

 Regarding  the  admission  of the duplicate, rather than the

original, the district court acted well within its discretion.

Under Federal Rule of Evidence 1003, "[a] duplicate is admissible

 -12-

to  the  same  extent as an original unless (1) a genuine question is

raised as to the authenticity of the original or (2) in the

circumstances it would be unfair to admit the duplicate in lieu of

the original." A duplicate is

 a counterpart produced by the same impression
 as the original, or from the same matrix, or
 by means of photography, including
 enlargements and miniatures, or by mechanical
 or electronic re-recording, or by chemical
 reproduction, or by other equivalent
 techniques which accurately reproduces the
 original.

Fed. R. Evid. 1001(4). The microform copy introduced here was a

"duplicate"  of  the  original check and was admissible subject to the

limitations of Federal Rule of Evidence 1003. Although Mulinelli

objected below to the document's "authenticity" and elicited

testimony that the microform was not the original, she failed to

elicit any testimony or make any proffer suggesting that the

original  had  been tampered with or altered in any way and that the

copy was not what it purported to be. See United States v.

Balzano, 687 F.2d 6, 8 (1st Cir. 1982) (declining to question

authenticity of duplicate where appellant failed to proffer

testimony,  beyond statement that evidence was not the original, of

alteration or tampering). The duplicate complied with the

requirements  of  Federal  Rule of Evidence 1003 and was admissible to

the  same  extent as the original. The district court did not abuse

its discretion in admitting the microform copy.

 Mulinelli's challenge below as to the "authenticity" of

the copy does not clearly identify the argument that the copy was

improperly authenticated. Nevertheless, giving Mulinelli the

 -13-

benefit of the doubt as to the scope of her objection below, we

r 1

states:   "The requirement of authentication or identification as a

condition precedent to admissibility is satisfied by evidence

sufficient  to  support  a  finding that the matter in question is what

its proponent claims." Such authentication can be provided by,

among  other  things, testimony of a custodian or percipient witness

 through "the document's '[a]ppearance, contents, substance eview  the  copy's  authentication. Federal Rule of Evidence 901(a) or ,

internal patterns, or other distinctive characteristics, taken in

conjunction with circumstances.'" United States v. Holmquist, 36

F.3d 154, 167 (1st Cir. 1994) (quoting Fed. R. Evid. 901(b)(4)).

We  have  recognized that "[i]f the court discerns enough support in

the record to warrant a reasonable person in determining that the

evidence is what it purports to be, then Rule 901(a) is satisfied

and the weight to be given to the evidence is left to the jury."

United States v. Paolino, 13 F.3d 20, 23 (1st Cir. 1994).

Iglesias' testimony regarding the conduct of the bank's loan

department and surrounding the issuance of this check, which

disbursed  funds for a fraudulent loan to Mulinelli's daughter, and

the characteristics of the check itself, adequately authenticated

1 Mulinelli directs our attention to three cases that deal with
the inadmissibility of evidence under the business records
exception to the hearsay rule. See United States v. Benavente
Gomez ,  921  F.2d  378  (1st  Cir. 1990); United States v. Kim, 595 F.2d
755 (D.C. Cir. 1979); United States v. Davis, 571 F.2d 1354 (5th
Cir. 1978). As the inadmissibility rulings in these cases relate
only to hearsay and not to authentication of evidence, they are
inapposite.

 -14-

the copy of the check, and we find no abuse of discretion in the

district court's admission of the copy.

 C. Leading questions

 During the government's direct examination of Exposito,

Mulinelli's counsel repeatedly objected to the leading nature of

the government's questions. Mulinelli restates the objection on

appeal, claiming that Exposito was not adverse or hostile to the

prosecution so as to warrant leading questions, and that the

court's overruling this objection limited her ability to properly

cross-examine Exposito because the prosecution, rather than

Exposito, was testifying.

 Federal Rule of Evidence 611(c) provides:

 Leading questions should not be used on the
 direct examination of a witness except as may
 be necessary to develop the witness'
 testimony. Ordinarily leading questions
 should be permitted on cross-examination.
 When a party calls a hostile witness, an
 adverse  party, or a witness identified with an
 adverse  party, interrogation may be by leading
 questions.

"[T]he use of leading questions '. . . must be left to the sound

discretion of the trial judge who sees the witness and can,

therefore, determine in the interest of truth and justice whether

the circumstances justify leading questions to be propounded to a

witness  by  the  party  producing.'" United States v. Brown, 603 F.2d

1022, 1025 (1st Cir. 1979). Our review of the transcript reveals

a witness who was, at times, unresponsive or showed a lack of

understanding. The prosecutor's use of leading questions was

limited to questions intended to lay a foundation for a line of

 -15-

questioning  or  to  assist  in developing coherent testimony. We find

that  such  questions were not improper and the district court acted

within its discretion when it allowed this manner of questioning.

See id. at 1025-26.

 Mulinelli also suggests that the district court

improperly questioned Exposito during his testimony. The few

occasions that Mulinelli points to do not suggest an abuse of

discretion.   See United States v. Olmstead, 832 F.2d 642, 648 (1st

Cir. 1987). The questions posed by the judge "served to . . .

clarify lines of inquiry or develop the witness's answer. Such

conduct is well within the court's discretion." Id.

 D. Limiting cross-examination as irrelevant

 In her attack on the prosecutor's use of leading

questions, Mulinelli juxtaposes the leeway granted the prosecutor

with  the  district court's curtailment of a line of questioning she

sought to pursue. Mulinelli argues that her defense was that

Exposito was brought to the bank by one of the bank officers, who

vouched for Exposito as creditworthy, and that, thus, Mulinelli

relied on the bank officer's support of Exposito. Because of her

reliance, Mulinelli argues, she was duped by the two into

unknowingly  providing  fraudulent bank loans to Exposito. Mulinelli

argues  on  appeal that she presented this theory to the jury in her

opening statement, but was unable, due to the district court's

limitation on her cross-examination of Exposito, to properly

present  the  theory during the course of the trial. The references

 -16-

to this defense during her opening statement consisted of the

following, separated by several pages of transcript.

 The evidence will show that Lazaro Exposito
 was brought to the bank by one of the highest
 officers of the bank. He did not come in by
 the regular channels. And the documents that
 were presented to the car department were
 brought by this highest officer of the bank.
 The  evidence  will show that he was recommended
 by this highest officer of the bank, and he
 started to buy repossessed automobiles, which
 was a department, an office under [Mulinelli]
 in  the  department of car loan that was managed
 or  directed  by a man named Otero. Of course,
 all under the general supervision of
 Mulinelli.

 * * *

 And finally, I think that the evidence, when
 you hear it in its totality, you will be
 convinced that there is a conspiracy of two
 crooks against Maria Mulinelli.

Trial Transcript, Dec. 18, 1995, at 26-27, 30.

 During Mulinelli's cross-examination of Exposito, the

following interchange took place:

 Q. Now, sir, you were not brought to First
 Federal in the usual way other dealers were
 brought in.

 MS. DOMINGUEZ:2 Objection as to relevance.

 MR. ABREU:3 It's an introductory question.

 THE COURT: Well --

 MR. ABREU: May I make a proffer?

 THE  COURT:   Why don't you ask him how did he
 come to the bank to begin with.

2 The Assistant United States Attorney.

3 Mulinelli's counsel.

 -17-

 Q. (Mr. Abreu) Sir, how did you get to
 First Federal Savings to the loan department
 as a dealer?

 A. It was through Mr. Alcocer.

 Q. Mr. Alcocer was one of the highest
 officers of the bank at that time, wasn't he?

 MS. DOMINGUEZ: Objection as to relevance.

 THE COURT: It think it's irrelevant.
 Sustained.

 MR. ABREU: May I make a proffer as to a
 line?

 THE COURT: Well, perhaps you should
 approach the bench and make a proffer.

 (Bench conference.)

 MR. ABREU: Your Honor, the proffer is the
 following: The regular practice in First
 Federal was sending young people to recruit
 dealers.   In  this particular case he came from
 one  of  the  highest officer[s] of the bank, who
 collected his information about the
 corporation to the department. He highly
 recommended [Exposito], said he had an
 excellent credit, and that's how he got --
 that's how they trusted him.

 THE COURT: It is total[ly] irrelevant to
 the issues of this case. This is a very
 discreet,  unique, well-defined conduct that is
 the object of these charges. Has nothing to
 do with Mr. Alcocer.

Trial Transcript, Dec. 19, 1995, at 177-78.

 As we noted above, a defendant has a right to effective

cross-examination. Delaware v. Van Arsdall, 475 U.S. 673, 679

(1986).   Once  that  constitutional threshold has been met, the trial

court  "retain[s] wide latitude to impose reasonable limits on such

cross-examination based on concerns about, among other things,

harassment, prejudice, confusion of the issues, the witness's

 -18-

safety, or interrogation that is repetitive or only marginally

relevant." Id. The question before us is whether the district

court judge "exceeded his powers to limit cross-examination."

United States v. Malik, 928 F.2d 17, 19 (1st Cir. 1991). In this

case, we find that the district court exceeded the boundaries of

its power and deprived Mulinelli of her ability to present her

theory of defense to the jury.

 The information presented by Mulinelli in her opening

statement and her proffer adequately indicated to the district

court  the  theory  of  defense she wanted to pursue. She mentioned in

her opening statement that "[t]he evidence will show that he

(Exposito) was recommended by this highest officer of the bank,"

which  suggests that the person with whom Exposito might have acted

to defraud the bank was not Mulinelli, but Alcocer, and at the

least that Mulinelli was influenced by the recommendation of

Alcocer. Such a theory of defense might suggest that, although

Mulinelli may have been negligent in relying on Alcocer's

recommendation and not questioning Exposito's loan applications

more closely than she did, she had no knowledge of Exposito's

fraudulent  transactions.  The information presented to the district

court adequately apprised the court of the relevance of the

channels  through  which  Exposito's loans were brought to Mulinelli's

attention, and the court, by foreclosing the introduction of any

testimony to support Mulinelli's theory of defense, violated

Mulinelli's  Sixth  Amendment right to confrontation. We next review

this error for harmlessness.

 -19-

 On direct appeal, we apply the harmless error standard

set  forth  in  Chapman v. California, which requires that we reverse

the conviction unless the government can prove that the

constitutional error complained of was "harmless beyond a

reasonable doubt." Chapman, 386 U.S. 18, 24 (1967); see also

United States v. Maguire, 918 F.2d 254, 266 (1st Cir. 1990)

(ordering a new trial where government failed to show

constitutional errors were harmless beyond a reasonable doubt).

Under this standard, we may not declare a constitutional error

harmless if there is a "reasonable possibility" that the error

influenced  the  verdict.   See United States v. Levy-Cordero, 67 F.3d

1002, 1015 n.15 (1st Cir. 1995) (holding that district court's

failure  to  hold  an  evidentiary hearing into validity of defendant's

proposed defense "was not 'harmless beyond a reasonable doubt'

because there is a 'reasonable possibility' that exclusion of the

proffered alibi evidence influenced the jury's verdict").

 On the particular counts that involved the Exposito

transactions, the government's proof of Mulinelli's knowledge

relied solely on the testimony of Exposito. While documentary

evidence was presented to support Exposito's acquisition of these

loans,  that  evidence did not necessarily corroborate his testimony

that Mulinelli encouraged him to apply for the loans or that she

set the terms of the loans. The alternative version of events --

that Exposito was brought to the bank by the officer and that the

officer  vouched for him -- would not necessarily have contradicted

Exposito's  testimony on direct examination but would have provided

 -20-

Mulinelli  with  the  opportunity to develop her own theory of defense

against these two counts.

 The  Sixth  Amendment, and thus the constitutional minimum

that must be allowed a criminal defendant before a trial court's

discretion  to  limit  cross-examination adheres, includes the ability

to develop and present a defense. See United States v. Muhammad,

928 F.2d 1461, 1467 (7th Cir. 1991) (holding that only after

satisfying the constitutional minimum of allowing a defendant to

present sufficient evidence for the jury to assess her theory of

defense and witness bias does the district court's discretion to

limit cross-examination inure); see also Washington v. Texas, 388

U.S. 14, 18 (1967) ("'A person's right to reasonable notice of a

charge against him, and an opportunity to be heard in his defense

-- a right to his day in court -- are basic in our system of

jurisprudence; and these rights include, as a minimum, a right to

examine the witnesses against him, to offer testimony, and to be

represented  by counsel.'" (quoting In re Oliver, 333 U.S. 257, 273

(1948)). The district court's ruling worked a severe restriction

on  Mulinelli's  ability  to elicit evidence relating to her theory of

defense.   Had the jury been presented with the theory, it may well

have accepted it and believed that Exposito's testimony was not

credible. As Exposito's testimony was the prosecution's only

evidence regarding Mulinelli's knowledge, the error of excluding

her theory of defense could not have been harmless, and warrants

reversal with regard to the loan transactions with Exposito. We

 -21-

therefore  vacate Mulinelli's conviction and sentences4

 CONCLUSION

 affirm in part and vacate

and remand in part.

4 on Counts 5 and 6 and remand to the district court for further proceedings in conformity with this decision. For the foregoing reasons, we  We note, however, that this outcome will not ultimately change
Mulinelli's sentence. Her original base offense level was six,
increased  eight levels under U.S.S.G. 2F1.1(b)(1) because the loss
was  determined  to  be  $349,000. The level was further increased two
levels in accordance with U.S.S.G. S 2F1.1(b)(2) because the
offense involved more than minimal planning and two levels in
accordance with U.S.S.G. S 3B1.3 because Mulinelli abused a
position  of  trust. Her sentence, based on these calculations, was
27 months for all six counts, to be served concurrently. The
calculations  remain  the  same, even after the loss from Counts 5 and
6 ($130,000) is excluded, because the district court enhanced for
an amount of loss over $200,000 under U.S.S.G. S 2F1.1(b)(1), and
the total loss for Counts 1 through 4 remains over $200,000. 

 -22-