UNITED STATES of America, Appellee,

v.

Edwin DIAZ–MARTINEZ, a/k/a Alexis El Boxeador, Defendant, Appellant.

Edwin DIAZ–MARTINEZ, Petitioner, Appellant,

v.

UNITED STATES of America, Respondent, Appellee.

Nos. 95–1083, 95–1536.

United States Court of Appeals, First Circuit.

Heard Nov. 7, 1995.

Decided Dec. 13, 1995.

James Kousouros, Kew Gardens, NY, with whom Debra K. Kousouros, White Plains, NY, were on brief, for appellant.

Edwin O. Vazquez, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and José A. Quiles–Espinosa, Senior Litigation Counsel, were on brief, for the United States.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

Following a shootout near the Bayamon Judicial Center in Bayamon, Puerto Rico, defendant Diaz–Martinez was convicted of possessing firearms with obliterated serial numbers. He appeals, saying he was forced to go to trial with defense counsel not of his choosing, that the prosecutor improperly argued at closing, that his sentence was too harsh under the Guidelines, and that the statute under which he was convicted cannot withstand Commerce Clause scrutiny under *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). We reject his claims and affirm.

## I

### Factual Background

The sounds of gunfire and a man[1] lying on the ground with critical gunshot wounds evidenced a gun battle on January 24, 1994 near the Bayamon courthouse and in the parking lot of the Santa Rosa Shopping Center. A law enforcement officer leaving the courthouse heard the shots and ran toward the parking lot. He saw the defendant running through the lot, pistol in one hand and a small object, probably a cellular phone, in the other. The officer saw the defendant fire two rounds and ran after him.

The defendant, who was found squatting behind some bushes, came out with his hands up when he saw the officer approaching and exclaimed that someone was trying to kill him. Other officers who had heard the shots and one of whom had seen the defendant with a gun also arrived at the scene. A search of the area where the defendant was found turned up a cellular phone and two guns. One gun had a bullet jammed inside. Both smelled of gunpowder, from recent firing. Both had their serial numbers obliterated. Twenty-two bullets were found in the shopping center parking lot. Expert analysis later indicated that thirteen had been fired from the two pistols. A car was also discovered in the parking lot, inside which were papers indicating it had been rented to the defendant, plus two nine millimeter bullet casings—the same caliber as the guns. Other nearby cars were marked with bullet holes.

Weapons charges were filed against the defendant under Puerto Rico law. After a finding of probable cause by the local court, those charges were dropped to accommodate the federal prosecution.[2] The federal indictment was filed on February 9, 1994, charging two counts of knowing possession of firearms bearing obliterated serial numbers that had been transported in foreign and interstate

---

1. The defendant later told police that he had gone to the Bayamon courthouse to pick up this man, and that they were fired upon as they were leaving the building.

2. At the time of his arrest, the defendant was facing unrelated homicide charges in the Puerto Rico local courts in connection with murders that had apparently received some public notoriety. Defendant says he is known in the media as Alexis El Boxeador (Alexis the Boxer) and that he was recognized by some of the police under that moniker. He was ultimately acquitted of the murder charges after a bench trial.

commerce in violation of 18 U.S.C. § 922(k). After a four-day trial commencing April 26, 1994, Diaz–Martinez was convicted on both counts of the indictment. He was sentenced to serve two concurrent terms of 45 months plus three years supervised release and was ordered on each conviction to pay $3,000 in fines and a special assessment of $50.

While this appeal was pending, the defendant filed a petition in the district court for collateral relief under 28 U.S.C. § 2255, arguing that his trial had been prejudiced by ineffective assistance of counsel. The district court dismissed the petition as premature, inasmuch as his direct appeal was still pending. The defendant appealed that dismissal. We consolidated the defendant's direct appeal from his convictions and sentence with his appeal from the dismissal of the section 2255 petition.

## II

### A. Sixth Amendment Right to Counsel Claim

■ Diaz–Martinez claims that the district court, by refusing to grant him extra time to seek out his own counsel and instead forcing him to go to trial with court-appointed counsel, denied him his right under the Sixth Amendment to choose his own attorney. His argument is without merit.

Since before his February 15, 1994 arraignment, the defendant had been represented by attorney Mendez–Lebron. When the district court on March 3, 1994, scheduled the defendant's trial for April 11, 1994, Mendez–Lebron was still his counsel of record. However, on March 29, less than two weeks prior to trial, Mendez–Lebron filed a motion to withdraw. On March 31, 1994, the district court held a hearing on Mendez–Lebron's motion, together with the defendant's motion to obtain new counsel. The defendant told the court that he had already contacted several other attorneys as potential replacements for Mendez–Lebron, and that one of them, attorney Acevedo, was on his way to the courthouse to be interviewed by the defendant.

The district court, after expressing skepticism as to why the defendant had waited so long to ask for new counsel, allowed Mendez–Lebron to withdraw, but warned the defendant that he would not tolerate strategic refusals to accept representation by particular counsel in order to delay the trial. The court adjourned to permit the defendant an opportunity to interview attorney Acevedo, and then reconvened later the same day. The defendant reported that Acevedo was unable to represent him, but that he had other candidates in mind whom he wished to contact. One of those candidates was attorney Jose Gaztambide.

The court, observing that the trial date was rapidly approaching, refused to give the defendant additional time to interview all of his potential choices and instead appointed Jose Gaztambide—one of the attorneys specifically identified by the defendant as someone he planned to contact—as defendant's counsel. As a further accommodation, the court ordered that the defendant, who was at the time under house arrest in Florida, be allowed to travel to Puerto Rico to confer with Gaztambide in preparation for trial, and also advised the defendant that he could, if he so chose, hire another attorney as Gaztambide's co-counsel. The defendant did not object to Gaztambide's appointment. The court also accommodated the defendant and his new counsel by granting, on the defendant's motion, a two-week continuance of trial. The trial started on April 26, 1994, with Gaztambide acting as defendant's counsel. At no time before or during trial did the defendant advise the district court that he was dissatisfied with Gaztambide's representation.

■ That a criminal defendant has an absolute right to counsel "does not confer an absolute right to a particular counsel." *United States v. Poulack*, 556 F.2d 83, 86 (1st Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977); *see also Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988) ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."); *Morris v. Slappy*, 461 U.S. 1, 13–14, 103 S.Ct. 1610,

1617, 75 L.Ed.2d 610 (1983) (Sixth Amendment does not guarantee that an accused have a "meaningful relationship" with trial counsel); *United States v. Betancourt–Arretuche*, 933 F.2d 89, 93 (1st Cir.), *cert. denied*, 502 U.S. 959, 112 S.Ct. 421, 116 L.Ed.2d 441 (1991). A district court's decision not to permit substitution of trial counsel is given deference and is reviewed only for abuse of discretion, especially when that decision is based on legitimate trial management concerns. *See Poulack*, 556 F.2d at 86 ("[T]he right of an accused to choose his own counsel cannot be insisted upon in a manner that will obstruct reasonable and orderly court procedure."); *see also United States v. Pierce*, 60 F.3d 886, 890–91 (1st Cir.1995), *petition for cert. filed* (U.S. Oct. 19, 1995) (No. 95–6474).

The appointment of Gaztambide as the defendant's trial counsel did not constitute an abuse of discretion and did not violate the defendant's Sixth Amendment rights. If anything, the defendant was granted *more* choice than he was due. *Cf. United States v. Allen*, 789 F.2d 90, 92–93 (1st Cir.) (affirming denial of request for new appointed counsel absent showing of good cause), *cert. denied*, 479 U.S. 846, 107 S.Ct. 164, 93 L.Ed.2d 103 (1986). The district court gave the defendant the benefit of the doubt in allowing his original attorney to withdraw.[3] When the defendant's first choice to replace that counsel refused the representation, the district court was understandably wary about the prospect of delaying trial in order to permit the defendant to interview his entire slate of alternate candidates. The court's decision simply to appoint one of the counsel *specifically identified as a candidate by the defendant himself* was surely a permissible means of expediting the process and minimizing delay. Both the public and the defendant have an interest in a prompt trial in criminal cases, and the judge properly acted to protect that interest.

■ A district judge's decision on a defendant's request to substitute trial counsel is entitled to "extraordinary deference" when granting the request would be at the expense of the court's trial calendar. *See Pierce*, 60 F.3d at 891; *see also Morris*, 461 U.S. at 11–12, 103 S.Ct. at 1616. Here, the district court's decision to permit the withdrawal of original counsel and to appoint one of the alternate candidates identified by the defendant himself (instead of waiting for the defendant to interview each candidate and make a decision on his own) reflected a fair balancing between the defendant's interest in choosing his counsel and the court's trial management needs. *Cf. Poulack*, 556 F.2d at 86. That the defendant never objected to the appointment of Gaztambide before or during trial makes the district court's decision all the more impervious to the defendant's post-conviction attacks.

## B. *The Prosecutor's Closing Argument*

■ Defendant argues that references made by the government in its closing argument to the shootout in the shopping center parking lot were improper and tainted his right to a fair trial. He claims that those statements encouraged the jury to convict him not on the basis of firearms possession, but on the basis of uncharged conduct: his participation in the shootout. This argument is unpersuasive.

■ The defendant made no objection to the allegedly improper statements during the closing argument, and so our review is only for plain error. *See United States v. De Masi*, 40 F.3d 1306, 1322 (1st Cir.1994), *cert. denied sub nom. Bonasia v. United States*, — U.S. —, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995). On the record before us, there was no such error.

In fact, there is no basis for concluding that the prosecutor's statements were improper at all. Testimony by prosecution witnesses concerning the shootout—some of it deliberately elicited by the defendant's own counsel on cross-examination—was admitted at trial *without objection* by the defendant. The prosecutor's comments about the incident were no more than proper references to that evidence.

---

**3.** The defendant's stated reason was that the original attorney was not his choice but had been selected by another of his lawyers representing him in a different criminal matter.

■ The defendant's complaint about the prosecution's closing argument relies upon an unrealistic view of the firearms charges. The prosecution was not limited, as defendant would have it, to saying simply that the defendant was found in a shopping mall parking lot, with firearms on the ground nearby. Such utter elimination of context would have unfairly handicapped the government's case, leaving it unable to respond to the defendant's trial theory that the law enforcement officer who first found him had planted the weapons in the parking lot in order to frame him. The government could provide the jury with a coherent story that met this defense, and it committed no transgression by commenting on the evidence admitted at trial.[4] *See United States v. Garcia,* 818 F.2d 136, 144 (1st Cir.1987).

The prosecutor also explicitly asked the jury to base its verdict on the elements of the firearms possession charges, *not* on evidence of the shootout.[5] The court gave instructions cautioning the jury that the defendant was not charged with any offenses other than those detailed in the indictment. There was no danger that the jury was prompted by the government's argument to convict the defendant on the basis of extraneous conduct.

■ Finally, the defendant claims that the prosecutor impermissibly attempted to shift the burden of proof to the defendant by making the following statement in his closing:

Ah, but the government has not present[ed] evidence that these two weapons came from Brazil. It's not enough that we don't have manufacturers? The government has to prove that it [h]as traveled in interstate or foreign commerce. We don't have to prove that they were brought from Brazil. But it is the government's burden to bring evidence? Of course not.

The context of this statement makes it clear that it was not improper. The statement was made in connection with a discussion of the interstate or foreign commerce element of the section 922(k) offense. It responded to the defendant's suggestion that the government had produced no evidence that the guns had been brought to Puerto Rico from Brazil. In fact, one of the government's witnesses had testified that the firearms' country of manufacture and the importer's location could be determined by examining the identifying markings engraved on weapons imported to this country. The government's response to this criticism continued:

When you go, you examine—you have to examine this weapon to see the obliterated serial number. The same weapon says that the manufacturer is located at Brazil. That is the best evidence and that the importer is located at Miami. What else [do] you need to find out? No manufacturers in Puerto Rico. Therefore, it ha[d] to come [from] foreign commerce or [a] foreign country or interstate.

The import of these statements was clearly that, because no gun manufacturers exist in Puerto Rico, and because the weapons themselves bore evidence that they had been manufactured in Brazil and imported originally to Miami, the government did not need to produce additional or more direct evidence that the guns had been brought from Brazil in order to prove the interstate or foreign com-

---

4. The defendant also seems to suggest that evidence of the shootout constituted references to "other crimes" inadmissible under Fed.R.Evid. 404(b). Because, however, the "shootout" was integrally related to the evidence linking the guns to the defendant (the possession charges), that evidence could not have been barred by Rule 404(b). *See United States v. David,* 940 F.2d 722, 737 (1st Cir.1991), *cert. denied,* 504 U.S. 955, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992).

5. The defense criticized as extremely thin the government's evidence that the defendant had ever fired any weapon in the shopping center parking lot. In response, the prosecutor commented:

And [defendant's counsel] has been talking about firing, firing, firing, firing. Ladies and gentlemen of the jury, this defendant is not charged with firing a weapon. . . . [T]hat is irrelevant, not because I said that, [but] because the judge is going to instruct that on the law. [Sic] And if you see [i]n that instruction that one of the elements is firing, I'm going to request to all of you that you bring a verdict of not guilty, if you heard that instruction. But if you heard the instruction that the government was to prove only possession of a weapon as [you] are going to be instruct[ed] by the judge, bring a verdict of guilty. [Paragraph structure omitted.]

merce element of the section 922(k) offense. The court's instructions to the jury—as well as other portions of the government's own closing—made unmistakably clear that the burden rested solely upon the government to prove the defendant's guilt, and each element of the offenses with which he was charged, beyond a reasonable doubt.

### C. Sentencing Issues

#### 1. Criminal History Category

 The district court departed upward from a Guidelines-directed criminal history category ("CHC") of II to a CHC of IV, based on a finding that the former classification did not adequately reflect the seriousness of the defendant's criminal history. We affirm.

The specific grounds for the district court's CHC departure were (1) that the defendant had engaged in prior similar criminal conduct (including weapons offenses) that had not resulted in conviction; and (2) that the defendant, at the time he committed the federal offense, had been released on bail pending trial on charges filed in the local court, thus demonstrating a serious lack of respect for the judicial system and a high risk of recidivism. These are both encouraged grounds for upward departure under the Guidelines. *See* U.S.S.G. § 4A1.3(d) (Nov. 1994)[6] (departure from Guidelines CHC may be considered where "the defendant was pending trial or sentencing on another charge at the time of the [offense of conviction]"); U.S.S.G. § 4A1.3(e) (same, where defendant engaged in "prior similar adult criminal conduct not resulting in a criminal conviction"); *see also United States v. Shrader*, 56 F.3d 288, 292 (1st Cir.1995) (noting appropriateness of "recidivist determination" to departure decision); *cf. generally United States v. Rivera*, 994 F.2d 942, 947–49 (1st Cir.1993). Because the district court's CHC departure was based on grounds specifically provided for by the Guidelines, we defer to and find no error in the district judge's determination that the circumstances of the defendant's criminal his-

tory were understated by a CHC of II. *See Shrader*, 56 F.3d at 292 (quoting *Rivera*, 994 F.2d at 951–52).

#### 2. Guidelines Sentencing Range

 The district court departed upward from a Guidelines sentencing range of 21 to 27 months (assuming a CHC of IV), to impose concurrent sentences of 45 months on each conviction. The upward departure was the equivalent of an increase from a base offense level of 12 to a level of 17. The departure was permissible.

The defendant's suggestion that the district court's departure decision was based on no more than a dissatisfaction with the Guidelines sentencing range mischaracterizes and is contradicted by the record. To be sure, the district court did conclude that the sentencing range was unsatisfactory—that was why it entertained departure in the first place. What is important is that, as the court's lucid discussion at the sentencing hearing made clear, its "dissatisfaction" was not based on some "personal sense of inequity," *United States v. Wogan*, 938 F.2d 1446, 1449 (1st Cir.) (quoting *United States v. Norflett*, 922 F.2d 50, 54 (1st Cir.1990)), *cert. denied*, 502 U.S. 969, 112 S.Ct. 441, 116 L.Ed.2d 460 (1991), but rather was explicitly premised on features of the case that are contemplated as grounds for departure by the Guidelines.

The defendant was sentenced under U.S.S.G. § 2K2.1. Application note 16 to that guideline specifically permits upward departure where the defendant's underlying offense conduct "posed a substantial risk of death or bodily injury to multiple individuals." U.S.S.G. § 2K2.1, comment. (n. 16). Here, the district court expressly found that the defendant had discharged his two firearms in a congested shopping center parking lot just before he was apprehended. Noting that the incident occurred during the middle of the day, that the defendant had run his car into another vehicle in the parking lot, and that surrounding vehicles were riddled with bullet holes, the court concluded that the case was factually "out of the heartland" of

---

6. All citations to the Sentencing Guidelines are to the November 1994 version, the version in effect at the time of the defendant's December 1994 sentencing. *See United States v. Aymelek,* 926 F.2d 64, 66 n. 1 (1st Cir.1991) (district court should apply the version of the Guidelines in effect at the time of sentencing, barring *ex post facto* problems).

the applicable guideline and therefore was an appropriate candidate for departure under application note 16.

The grounds relied upon by the district court are supported by the record and are specifically permitted as a basis for departure in the commentary to section 2K2.1. The district court's determination that this case falls outside the heartland of cases encompassed by that guideline, as well as the magnitude of the departure, were appropriate. *See Rivera,* 994 F.2d at 951–52.

D. *Constitutionality of 18 U.S.C. § 922(k)*

■ Diaz–Martinez argues that this is a simple state weapons case which Congress had no power under the Constitution to federalize. The firearms possession statute under which he was convicted, 18 U.S.C. § 922(k), is unconstitutional, he says, because it exceeds Congress' power to legislate under the Commerce Clause, as interpreted in *United States v. Lopez,* — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). We hold to the contrary. Whatever the reach of *Lopez,* it does not invalidate 18 U.S.C. § 922(k).

In *Lopez,* the Supreme Court found significant that the statute at issue in that case, 18 U.S.C. § 922(q), "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." — U.S. at —, 115 S.Ct. at 1631. In contrast, that jurisdictional element is present here. The statute under which Diaz–Martinez was convicted contains a specific requirement that the firearm with the obliterated serial number have been "shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(k). Here there was proof that the firearms were made in Brazil, imported originally to Miami, and altered to remove the identifying number in violation of federal law. Section 922(k) is readily distinguishable from the provision that was invalidated in *Lopez,* and its enactment did not exceed Congress' authority under the Commerce Clause.

## III

*The Section 2255 Petition*

■ The dispositive question for the defendant's attempt to obtain relief under sec-

tion 2255 on grounds of ineffective assistance of counsel is whether the petition was prematurely filed. Believing that it was, we affirm the district court's order dismissing the petition without prejudice.

■ The settled rule in this circuit, as the defendant acknowledges, is that the district court should decline to hear claims for relief based on allegedly ineffective assistance of counsel until the direct appeal is decided, unless "extraordinary circumstances" are demonstrated. *See United States v. Buckley,* 847 F.2d 991, 993 n. 1 (1st Cir.1988), *cert. denied,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989); *United States v. Gordon,* 634 F.2d 638, 638–39 (1st Cir.1980) ("[I]n the absence of extraordinary circumstances, the orderly administration of criminal justice precludes a district court from considering a § 2255 motion while review of the direct appeal is still pending...." (internal quotation marks and citations omitted)). The district court explicitly found that "extraordinary circumstances" did not exist warranting consideration of the defendant's section 2255 petition during the pendency in this court of the defendant's direct appeal. The court thus dismissed the petition, without prejudice.

There is no basis for second guessing the district court's finding of an absence of "extraordinary circumstances." Because the record necessary for a determination of the ineffective assistance claim has not yet been factually developed, we decline to consider the issue at this time, preferring that the district court evaluate the claim in the first instance. *See United States v. Natanel,* 938 F.2d 302, 309 (1st Cir.1991), *cert. denied,* 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992); *United States v. Hunnewell,* 891 F.2d 955, 956 (1st Cir.1989). The government concedes that the petition may be refiled in the district court upon resolution of this appeal.

*Affirmed.*