USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1754 UNITED STATES, Appellee, v. BRIAN SMITH, Defendant, Appellant. ___________________ No. 95-1857 UNITED STATES, Appellee, v. GERALD YANOVITCH, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Charles W. Rankin, with whom Rankin & Sultan were on brief for __________________ ________________ appellant Brian Smith. Michael C. Bourbeau for appellant Gerald Yanovitch. ___________________ George W. Vien, Assistant United States Attorney,  ______________ with whom Donald K. Stern, United States Attorney, Carole S. Schwartz _______________ __________________ and Michael D. Ricciuti, Assistant United States Attorneys, were on ____________________ brief for appellee. ____________________ November 26, 1996 ____________________ CAMPBELL, Senior Circuit Judge. CAMPBELL, Senior ____________________ ______ Circuit Judge. A United States Grand Jury for the District _____________ of Massachusetts returned an indictment charging defendants- appellants Brian Smith ("Smith") and Gerald Yanovitch ("Yanovitch") with being felons-in-possession of a firearm (Count One) and ammunition (Count Two), in violation of 18 U.S.C. 922(g) (1976 & Supp. 1996), 2 (1969). After a five-day trial, a jury convicted the defendants-appellants on both counts of the indictment. Prior to sentencing, the district court, citing double jeopardy concerns, required the government to elect between counts, and the government chose to retain the conviction under Count Two. The district court sentenced Smith to the statutory maximum of 120 months in prison without supervised release or fine, and with a $50 assessment. The court sentenced Yanovitch to 78 months in prison, with three years supervised release, no fine and a $50 assessment. Both defendants filed timely notices of appeal. We affirm.  I. At approximately 8:00 to 8:30 p.m. on Friday, December 2, 1994, Mark Duggan was in Charlestown, Massachusetts to pick up a friend, Jonellen Ortiz. As Duggan drove to the parking lot in the rear of Ortiz's apartment building, he passed Smith. Duggan pulled his car into the -3- 3 parking lot and stopped. Through his rear view mirror, Duggan saw Smith approaching his car from behind.  Smith and Duggan had had a prior confrontation in Charlestown approximately two months earlier concerning a woman, Colleen King, who was the mother of Smith's son and Duggan's former girlfriend.  Duggan got out of the car, exchanged words with Smith, who was thirty to forty feet away, and then reached back into the car and retrieved a baseball bat. Smith reached into his pants and pulled out a dark, small caliber, semi-automatic handgun and showed it to Duggan. There was a standoff, and Smith eventually left the area.  After the encounter with Duggan, Smith and King met King's best friend, Melissa Brown, on a street in Charlestown. Brown had known Smith for approximately five years, and was the godmother of Smith's and King's son. The three of them walked to a liquor store on Main Street in Charlestown, where they purchased beer. They, then, went to King's apartment, located in the same housing development in which Ortiz lived.  Later in the evening, Yanovitch and his date, Danielle Scanlon, arrived at King's apartment and joined the others in drinking beer. All of them left King's apartment and got into the large, dark-colored, four-door Lincoln Town Car in which Yanovitch and Scanlon had arrived that evening. -4- 4 With Yanovitch driving, they traveled to a bar named "Kelly's Cork and Bull" in South Boston. The group arrived between 11:30 p.m. and midnight, and stayed there about one and one- half or two hours.  Near closing time, Smith and Yanovitch became involved in a conversation with Robert Viens, Jr., Brown's former boyfriend. Smith and Viens began to argue about a gun, and the argument spilled into the street. Yanovitch, King and Brown, as well as Viens's friend, Walter Veneau, and the latter's girlfriend, Tammy Tetreault, followed them out of the bar. Once outside, Yanovitch, King and Brown walked over to their Lincoln, which was parked nearby. Smith and Viens continued to argue outside the bar. Smith said to Viens that he wanted to speak with him alone, and the two of them walked down the street together away from the bar. Smith, then, reached inside his jacket, and Viens responded by throwing punches at Smith. The fight moved back towards the Lincoln, as people tried to break it up. Veneau pulled his friend Viens back from Smith as Smith was pulled into the center of the Lincoln's back seat, with King on one side of him and Scanlon on the other.  Yanovitch, who was still outside the Lincoln, exchanged words with Viens, and then partially entered the car through the driver's side door. From the back seat, Smith handed a handgun to Yanovitch. Yanovitch got out of -5- 5 the car with the gun, proceeded to fire one round into the ground, and then shot Viens. Viens ran and staggered up the street away from Yanovitch. Yanovitch shot Viens again, and Viens fell to the ground. From behind, Yanovitch closed on Viens, pointed the gun at his head, and fired again. Yanovitch, then, ran back to the Lincoln, got behind the wheel and sped away with his friends. After Yanovitch sped away, Veneau went to comfort Viens, who was lying in the street. The Boston Police and paramedics in an ambulance responded to the scene. The paramedics found Viens alive, lying on his back in the street. Viens had two small-caliber entry wounds and a third small-caliber exit wound. One of the entry wounds was in his left front chest, while the exit wound was in the right side of his chest. Viens was uncooperative, refused to give his name, and even told witnesses at the scene not to cooperate with the police. The paramedics placed Viens in the ambulance and took him to Boston City Hospital. A friend drove Veneau to Boston City Hospital, where he saw Viens's parents. Although he initially refused to cooperate with the police, Veneau changed his mind after speaking with Viens's father. Veneau, then, gave a tape recorded interview to Boston Police Sergeant Detective James Wyse. -6- 6 Without information from the victim or witnesses, the police searched the area of the shooting, but initially did not find any ballistics evidence. After speaking with Veneau concerning the exact location of the shooting, police officers returned to the crime scene and recovered two spent .25 caliber shell casings. One of the casings was found approximately fifteen to twenty-five feet from where Viens was lying when the police and paramedics found him. The other casing was recovered an additional ten to twenty feet away from the first casing. Smith and Yanovitch were arrested on the basis of a complaint. On January 24, 1995, a grand jury returned an indictment charging Smith and Yanovitch with being felons-in- possession of a firearm (Count One) and ammunition (Count Two), in violation of 18 U.S.C. 922(g) (1976 & Supp. 1996), 2 (1969). At trial, Smith and Yanovitch stipulated that they were convicted felons at the time of the shooting. The government called a paramedic, Michael Sullivan, and two police officers, Wyse and Lieutenant Gary French, who had responded to the scene. After speaking with Veneau at Boston City Hospital, French returned to the crime scene and recovered the two shell casings. The government also called Alcohol, Tobacco and Firearms ("ATF") Special Agent, Allan Offringa, who testified on direct examination that the .25 caliber shell casings were manufactured outside -7- 7 Massachusetts, and that the only .25 caliber pistol manufactured in that state was manufactured by a company named Harrington and Richardson ("H & R"), which started making the gun in 1909 and stopped doing so before World War II. Boston Police Ballistician, Edward Szalno, testified that the marks found on the spent shell casings were not made by an H & R pistol. The government obtained compulsion/immunity orders for two of the women who were in the car with Smith and Yanovitch. Although these women, Brown and Scanlon, claimed that they did not see the shooting, they did confirm that they were out with Smith, Yanovitch and King on the evening in question, and that Yanovitch got into the driver's seat of the car shortly after they heard gun shots. Both women also confirmed that Smith was seated in the middle of the back seat of the car. Duggan was called as a witness by the government. He recounted his confrontation with Smith earlier in the evening in question. Veneau and Tetreault testified to having witnessed the shooting. They said that the man in the middle of the back seat of the car handed Yanovitch a gun, which the latter used to shoot Viens. After the trial and conviction of Smith and Yanovitch on both counts of the indictment, and the government's election of Count Two, the court sentenced Smith to the statutory maximum of 120 months in prison, and -8- 8 Yanovitch to 78 months in prison, with three years of supervised release.  II. On appeal, Smith presents a host of issues, claiming errors at trial and in sentencing. As most of these issues were not raised in the district court, they are reviewable on appeal only for plain error. Yanovitch challenges his sentence and says that he adopts by reference any additional issues raised by Smith which could materially affect his rights in this case. A. The Nondisclosure of Test Results _________________________________ At trial, Ballistician Edward Szalno testified that the two shell casings that were recovered from the crime scene were fired from a .25 caliber semi-automatic weapon, but that the weapon was not a Harrington & Richardson ("H & R") pistol. Since H & R is the only company that has ever manufactured a .25 caliber semi-automatic weapon within the state of Massachusetts, the effect of this testimony was to indicate that the gun used had traveled in interstate commerce. Prior to testifying, Szalno had test-fired an H & R .25 caliber semi-automatic pistol, and had compared the shell casings with those found at the crime scene. This comparison confirmed his earlier conclusion that the casings -9- 9 recovered from the crime scene were not fired from an H & R pistol. Smith's counsel says he first became aware of this test-firing during his cross-examination of Szalno. He, then, moved to strike Szalno's testimony on the ground that the government had violated its discovery obligations by failing to inform the defense of the test. Counsel argued that this discovery violation affected his cross-examination and prejudiced Smith's defense. The court ruled that the government should have provided defense counsel with the observed results of the test-firing, even though no written report had been generated. The court refused, however, to strike Szalno's testimony, noting that defense counsel had not sought a continuance to counter the evidence and had, in effect, created the problem at hand by asking questions without first determining the likely responses. The provisions that might arguably have required advance disclosure of the test-firing results are Rule 116.1 of the Local Rules of the United States District Court for the District of Massachusetts and Federal Rule of Criminal Procedure 16(a)(1)(D). The former states, in relevant part, "The government shall disclose, and allow the defendant to inspect, copy and photograph, all written materials as follows: (3) . . . all scientific tests, experiments and comparisons, or copies thereof, made in connection with a -10- 10 particular case." D. Mass. R. 116.1(a)(3). As the Local Rule is expressly limited to written materials, of which none were generated here, it was not violated.  The other proviso upon which Smith relies is Federal Rule of Criminal Procedure 16(a)(1)(D), which does not speak specifically of written materials only.1 However, the words "inspect and copy or photograph" logically suggest that the items to be disclosed be tangible enough to be susceptible to inspection, copying or photographing. Fed. R. Crim. P. 16(a)(1)(D); see also Fed. R. Crim. P. 16(a)(1)(A), ________ (C). Our circuit has expressly reserved decision on whether Rule 16(a)(1)(D) requires the disclosure of unrecorded personal observations of tests and the like. Compare United _______ ______ States v. Veilleux, 40 F.3d 9 (1st Cir. 1994), with United ______ ________ ____ ______ States v. Tejada, 886 F.2d 483 (1st Cir. 1989). Other ______ ______ circuits, however, have held that such unrecorded information is not covered by Rule 16(a)(1)(D). United States v. Shue, _____________ ____ 766 F.2d 1122, 1135 (7th Cir. 1985) (the Rule does not require disclosure of expert's oral statements made after comparing photographs); United States v. Johnson, 713 F.2d _____________ _______ 654, 659 (11th Cir. 1983) (where no report was prepared by  ____________________ 1. The relevant language of the Rule provides, "Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports . . . of scientific tests or experiments, or copies therof, which are within the possession, custody, or control of the government . . . ." -11- 11 expert, no discovery obligation was incurred under the Rule). See also United States v. Peters, 937 F.2d 1422, 1425 (9th _________ _____________ ______ Cir. 1991) (similar language in Rule 16(b)(1)(B), "cannot pertain to oral information"). We think the above decisions of the Seventh, Eleventh and Ninth Circuits are consistent with the plain language of Rule 16(a)(1)(D), and hold that where the test result in question consisted of the expert's unrecorded comparison of the test-firing casings with those at the crime scene, Rule 16(a)(1)(D) did not obligate the government to produce in advance the expert's conclusions. This being so, we find no error in the court's refusal to strike Szalno's testimony.2 While this ends the matter, we also agree with the district court that there was a total absence of prejudice from the nonproduction of the expert's observations following the test-firing. Smith argues that, had he known about Szalno's test-firing, he would not have cross-examined him in the manner he did, to his detriment. However, before Szalno took the stand, ATF Special Agent Offringa had already testified that he had test-fired an H & R pistol, and that he had given the casings to Szalno for a comparison. In addition, Szalno himself testified on direct examination that  ____________________ 2. The arguments on this appeal do not involve the separate requirements of Rule 16(a)(1)(E) on Expert Witnesses, which requires the government, on the defendant's request, to disclose a summary of the expert's opinions, the bases and the reasons therefor. -12- 12 he had examined two cartridge cases that had been fired from an H & R .25 caliber semi-automatic pistol and had made reference to the FBI's General Rifle and Characteristics book. Smith was, therefore, on notice prior to cross- examination that Szalno had compared the casings from the crime scene with others that were test-fired from an H & R pistol. The test-firing of an H & R pistol was, moreover, relevant only to the interstate element of the firearm convictions, which the government later elected to dismiss. The test-firing was irrelevant to the ammunition charges upon which both Smith and Yanovitch were sentenced, it being undisputed the casings had been manufactured in Arkansas. As only the latter convictions stand, the claimed error would have been harmless. B. The Admissibility of Evidence Concerning Smith's ________________________________________________________ Possession of a Firearm Earlier on the Night in Question ________________________________________________________ Duggan testified that he had a confrontation with Smith earlier on the evening in question, in which Smith displayed a small, semi-automatic handgun. Smith contends that such testimony was admitted in violation of Federal Rule of Evidence 404(b) because it was evidence of a prior bad act offered solely to prove Smith's propensity to use guns.3 For  ____________________ 3. Rule 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that -13- 13 evidence of this sort to be admissible, it must be shown to bear some special relevance to an aspect of the case at hand, other than merely to the defendant's propensity to do bad things. See United States v. Cortijo-Diaz, 875 F.2d 13, 15 ___ ______________ ____________ (1st Cir. 1989). Here, Smith argues, the testimony lacked such special relevance and was used by the government simply as propensity evidence. Smith did not, however, object at trial to Duggan's testimony in this regard.4 Our review is, therefore, limited to plain error. Under that standard, the burden falls on appellants to show that there is an error, that the error is clear or obvious, and that the error affected the outcome of the proceedings below. United States v. Olano, 507 U.S. 725, _____________ _____ 732-34 (1993). Because the challenged testimony was proper evidence of the crimes charged, the court did not commit error, much less plain error. Far from merely relating to "other crimes, wrongs, or acts," Fed. R. Evid. 404(b), Duggan's testimony helped  ____________________ upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Fed. R. Evid. 404(b). 4. Smith had objected earlier to questions about conversations Duggan might have had with Smith regarding King, complaining that such conversations were irrelevant. At sidebar, the government explained the relevance of such testimony. Smith did not object thereafter. Neither did he object to that portion of the government's closing argument based upon Duggan's testimony. -14- 14 establish that Smith knowingly possessed a firearm (Count One) and ammunition (Count Two), as required under 18 U.S.C. 922(g) (1976 & Supp. 1996). The decisions in United States _____________ v. Diaz-Martinez, 71 F.3d 946 (1st Cir. 1995), and United _____________ ______ States v. Klein, 13 F.3d 1182 (8th Cir.), cert. denied, 114 ______ _____ _____________ S. Ct. 2722 (1994), are instructive. In Diaz-Martinez, the _____________ defendant, who was charged with possession of firearms with obliterated serial numbers in violation of 18 U.S.C. 922(k) (1976 & Supp. 1996), was involved in a shootout immediately before his arrest, at which time police recovered the firearms. We dismissed defendant's argument that the government improperly referred to the shootout in its closing argument stating, "[B]ecause . . . the shootout was integrally related to the evidence linking the guns to the defendant (the possession charges), that evidence could not have been barred by Rule 404(b)." Diaz-Martinez, 71 F.3d at _____________ 951 n.4. The Eighth Circuit reached the same conclusion in Klein on comparable facts. Klein, 13 F.3d at 1184. _____ _____ Even assuming that the possession charge related only to the weapon with which Viens was shot, Duggan's testimony that Smith was in possession of a similar handgun earlier that evening tended to establish that Smith possessed the same handgun a few hours later, at the time of the shooting. The district court did not commit plain error in admitting Duggan's testimony. -15- 15 C. The District Court's Control of Smith's Cross- ________________________________________________________ Examination ___________ Smith argues on appeal that the district court erroneously restricted his cross-examination of Duggan. Duggan first informed police of his encounter with Smith about two weeks before trial, after he had been taken into custody on unrelated charges. Smith contends that he wanted to establish on cross-examination that, at the time of his testimony, Duggan had pending against him a number of criminal charges. This line of questioning would have enabled Smith to argue that Duggan had slanted his testimony to gain better treatment from the government. Smith complains that the district court severely limited his ability in this regard.  A district court's discretion to control cross- examination, while broad, is not unlimited. See United ___ ______ States v. Camuti, 78 F.3d 738, 742 (1st Cir. 1996). However, ______ ______ we find little indication that the court restricted cross- examination in the asserted manner. Moreover, counsel did not at the time complain to the court of being so limited, hence we review only for plain error, Olano, 507 U.S. at 733- _____ 34, a standard clearly not met on this record.  During the initial stages of cross-examination, when counsel asked Duggan if he had cases pending against him, the district court sustained the government's objection. Defense counsel then asked whether the government had helped -16- 16 him with his pending cases. Duggan answered in the negative. Later, counsel asked whether Duggan was aware that Ortiz had filed a complaint against him for threatening her with bodily harm. The government objected, and a sidebar followed. During the sidebar, the district court stated, "Perhaps I was precipitant." It allowed counsel to pursue the challenged line of questioning. Duggan then conceded that he was aware of Ortiz's complaint at the time he contacted the police. After counsel finished questioning Duggan regarding Ortiz's complaint, he did not proceed with similar questions relative to other pending matters nor ask the court to allow him to do so nor indicate that he felt unduly limited. We find no merit in Smith's argument on appeal that the court improperly restricted his cross-examination of Duggan. D. Duggan's Prison Reference and its Impact on the Trial _____________________________________________________ Duggan mentioned during his direct examination that King's "ex-boyfriend" had recently been released from prison, an obvious reference, Smith says, to himself. Smith's counsel promptly objected, and the court ordered the challenged testimony struck.5 Smith's counsel did not ask  ____________________ 5. Duggan made the disputed reference during the following exchange: Q: And how did your relationship with [King] develop?  A: Went on through the summer, the spring, and the summer of '94 and stopped in October of '94. Q: And why did it stop on October of '94? A: Her reason was, ah, that it was -- -17- 17 for a mistrial at the time, but, on appeal, now argues that the court erred in not declaring a mistrial sua sponte.  __________ Absent a request for a mistrial, this court's review of the court's failure to order a mistrial is for plain error only. Olano, 507 U.S. at 733-34. Smith argues _____ that, since it was clear to the jury that Duggan was referring to Smith as having been released from jail, the response was so prejudicial as to necessitate a mistrial. The district court, however, took some curative measures. It sustained Smith's objection and struck Duggan's remark. As counsel asked for no more at the time, the trial court could reasonably assume that Smith was satisfied. The degree of prejudice was neither so obvious nor so clear that only a mistrial would have satisfied the needs of justice.  In United States v. Cresta, 825 F.2d 538 (1st Cir. _____________ ______ 1987), this court laid out the factors that must be  ____________________ Defense Counsel: Objection. The Court: Sustained as to anything she may have said. Q: Without saying what she said, why did you stop seeing her in October? A: The relationship ended because her ex- ______________________________________________ boyfriend got out of jail. _________________________ Defense Counsel: Objection. The Court: The objection is sustained and the answer is stricken. That's something someone told you, right? The witness: Yes, it would be, I guess. The Court: Yes, its -- someone told you. The witness can only testify to what they know, not what people told them. The answer is stricken; disregard it. -18- 18 considered in evaluating an otherwise improper reference to an accused's prior imprisonment: whether the remark was isolated, whether it was deliberate or accidental, whether the trial court's instruction was sufficient to counteract any prejudice that might have flowed from the remark, and whether any remaining prejudice could affect the outcome of the case. Cresta, 825 F.2d at 550. The remark in the ______ present case, as the government points out, was a single, isolated and accidental reference by a witness trying to answer a question designed to address defense counsel's hearsay objection. Smith himself had already stipulated that he was a convicted felon. The disputed remark added little, therefore, to what the jury could already surmise. We do not find plain error in the court's failure to order a mistrial sua sponte. __________ E. The Questioning of Defense Witness Ortiz ________________________________________ On cross-examination, the government was allowed, over Smith's unexplicated objection, to ask defense witness Ortiz whether she had acted as a confidential informant for the Drug Enforcement Administration ("DEA") and whether, as such, she had helped the DEA obtain a search warrant for the apartment of her friend, Colleen King. Smith now argues that the district court should have excluded these questions because they were irrelevant and because by implying that Smith's girlfriend was the subject of a drug investigation  -19- 19 they unduly prejudiced him and his case. Smith also asserts that the district court erred in preventing him from establishing that the DEA's subsequent search of King's apartment yielded no evidence of illegal drugs. Eliciting such evidence was relevant, Smith says, to undermine any concerns about the credibility of the witness and to rebut the prejudicial characterization of Smith and his girlfriend. We do not find plain error. One problem with these arguments is that Smith never advised the district court of the reasons he now advances on appeal for excluding the government's line of inquiry. Federal Rule of Evidence 103 states that error may not be grounded upon an evidentiary ruling "unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection ______ or motion to strike appears of record, stating the specific ________ ground of objection . . . ." Fed. R. Evid. 103(a)(1) (emphasis added). Counsel had been informed in advance that the government planned to cross-examine Ortiz concerning her DEA connections, and while he objected, he did not argue that the information was irrelevant nor did he claim prejudice under Rule 403. And when the district court limited Smith's redirect examination of Ortiz, Smith made no objection. Our review, therefore, is only for plain error. Olano, 507 U.S. _____ at 733-34. -20- 20 The government contends that its cross-examination was designed to impeach Ortiz, and not to smear Smith and King.6 Ortiz denied that she had ever furnished information to the DEA, the government did not implicate Smith during its cross-examination of Ortiz, and the court instructed the jury that counsel's questions did not constitute evidence. Even assuming arguendo, it was error to allow the government to cross-examine Ortiz as it did, we conclude the error caused slight, if any, damage to Smith. The limitation of Smith's redirect was likewise far short of plain error. The subject matter was of border-line relevance, hence well within the discretion of the court to control, see Fed. R. Evid. 401. ___ F. The Government's Closing Argument _________________________________ Smith claims that the prosecution misstated the evidence on four separate occasions in its closing argument. These alleged misstatements, according to Smith, went to the heart of the case, were not corrected by the district court and, therefore, warrant the reversal of his conviction. The challenged statements, and this court's reasons for rejecting Smith's present claims, are set forth below.  ____________________ 6. The government says it sought to establish biases or motives to lie on the part of Ortiz. To do so, the government claimed that Ortiz and King had been in the drug business together, that information provided by Ortiz to the DEA contradicted her testimony at trial, and that Ortiz was capable of duplicitousness (and, thus, of lying on the stand). -21- 21 Smith concedes that he did not object at trial to the challenged statements. Consequently, we review his present claims under the plain error standard. Olano, 507 _____ U.S. at 733-34. In so doing, we consider a number of factors, "including the frequency and deliberateness of the prosecutor's comments, the strength and clarity of the trial judge's instructions, and the strength of the government's case against the defendant." United States v. Morales- ______________ ________ Cartagena, 987 F.2d 849, 854 (1st Cir. 1993); see also United _________ ________ ______ States v. Tajeddini, 996 F.2d 1278, 1282 (1st Cir. 1993).  ______ _________ The first disputed statement, that Mark Duggan testified that he saw Smith with a .22 or .25 caliber pistol __________________________ on the night in question, is the only characterization of evidence that can be termed a misstatement. We do not find, however, that the prosecutor's description strayed far enough from Duggan's actual testimony, "a small caliber handgun," to amount to plain error. However described, the small caliber handgun mentioned in Duggan's testimony was consistent with the .25 caliber casings recovered after the shooting. The prosecutor's mistake was not so serious as to imply bad faith or deliberate prevarication. Also, the case against Smith was strong, and the court properly instructed the jury on the effect of the lawyer's statements. The misstatement, such as it was, fell well below the plain error threshold. See ___ Morales-Cartagena, 987 F.2d at 854-55. _________________ -22- 22 As for the three remaining challenged remarks,7 at least two were amply supported by the record. Statement #2 rested on Veneau's testimony that the government protected him and helped him move out of South Boston, and that he had not gone to the police for fear of the defendants. Statement #4 was a fair inference from the testimony of Boston Police Lieutenant French. Statement #3 is more problematic but in no way amounts to plain error. The government argues in its brief that the prosecutor referred to the jury as having "sat ________ up there" and seen the witness's, Tetreault's, fear. If this is what the prosecutor said, the remark was unexceptionable, since the jury had observed Tetreault on the stand and could determine whether or not she exhibited fear. The transcript, however, indicates the prosecutor as actually having said that "he sat up there" and saw fear in Tetreault's face. If the "he" referred to Veneau, the comment was arguably garbled, since by the time Veneau testified at the trial, he had already retracted earlier misstatements to police that Tetreault had been absent. But, even accepting the latter  ____________________ 7. Statement #2: The government stated that Walter Veneau could not go back to South Boston after he testified. Statement #3: The government stated that Walter Veneau did not tell the police his girlfriend was at the scene of the shooting because "he sat up there and saw the fear" on her face. Statement #4: The government stated that the police found the shells where Walter Veneau told them the shooting had taken place. -23- 23 version, the unobjected-to remark was harmless and fell far short of constituting plain error. G. The Meaning of "Ammunition" ___________________________ Smith contends on appeal that the district court, through certain unobjected-to instructions given to the jury while the trial was in process, erroneously directed a verdict in the government's favor on the elements of ammunition and interstate commerce. According to Smith, the district court wrongly told the jury that the casings which were received into evidence were ammunition, and had traveled in interstate commerce.8 Such instructions, according to the defense, had the effect of directing the jury to find against Smith on two essential elements of the offense. See United ___ ______ States v. Argentine, 814 F.2d 783, 788-89 (1st Cir. 1987) ______ _________ (quoting United States v. Natale, 526 F.2d 1160, 1167 (2d ______________ ______ Cir. 1975), cert. denied, 425 U.S. 950 (1976)). Smith, thus, ____________ concludes that the district court committed plain error, requiring the reversal of his conviction. The district court made the challenged remarks in the course of certain mid-trial comments to the jury  ____________________ 8. Smith challenges the following statements made by the court in the course of remarks to the jury during the trial relative to evidence on the cartridge casings: "Despite what may have been raised in the opening statements to you, the cartridge case, standing alone, is ammunition under federal law. So the cartridge case originally was made out of state, found its way into Massachusetts. Whether or not it was reloaded, it still moved in interstate commerce."  -24- 24 intended, among other things, to correct an earlier misstatement by Yanovitch's counsel relative to the definition of "ammunition." Counsel had stated that shell casings were not ammunition, an assertion contrary to the definition set forth in 18 U.S.C. 921(17)(A) (1996): "The term 'ammunition' means ammunition or cartridge cases . . . ." Before correcting counsel, the trial court indicated to the jury that it was instructing them as to the law, not as to the evidence. If counsel wished clarification, he should have asked for it at the time. In its final charge to the jury, the district court clearly informed the jury of the government's burden to prove beyond a reasonable doubt defendants' possession of ammunition and of the movement of the ammunition in commerce, and gave accurate, extensive and clear instructions on each of these points. We do not find plain error.9  H. The Meaning of "In or Affecting Commerce" _________________________________________ Smith challenges the accuracy of the court's jury instruction on the meaning of the phrase "in or affecting commerce." As he did not object to the instruction, our review is for plain error only. Olano, 507 U.S. at 733-34. _____ After considering the instruction, and the prevailing case  ____________________ 9. As noted previously, there was uncontested evidence that the cartridge casings found at the scene were made in Arkansas, permitting the inference that they had traveled interstate. -25- 25 law, we conclude that the court did not commit error, plain or otherwise.10  As part of its case, the government had to prove that possession of the ammunition was "in or affecting commerce." 18 U.S.C. 922(g)(1) (1976 & Supp. 1976). The Supreme Court in Scarborough v. United States, 431 U.S. 563, ___________ _____________ 575 (1977), held that evidence showing that a weapon had crossed state lines is legally sufficient to satisfy this element of the statute. Smith, while not disputing the above, contends that it should have been left solely to the jury to decide whether the ammunition's crossing of state lines could establish that possession was "in or affecting commerce." This argument runs counter to the principle that the court, not the jury, is responsible for declaring the law. Here, the court's instruction finds support in  ____________________ 10. The court instructed the jury as follows: "So the government has to prove beyond a reasonable doubt that the firearm, taking the firearm charge, and the ammunition, taking the ammunition charge, was in commerce. That doesn't mean that they have to prove Mr. Yanovitch or Mr. Smith carried the items across a state line. But the government does have to prove beyond a reasonable doubt that at some time after the firearm or ammunition was manufactured, up till the time when the person you're considering possessed it, if you find that one or both of them did possess it, that the item, the firearm, or ammunition, or both, were in commerce, which means it went across a state line . . . ." -26- 26 Scarborough and in circuit precedents spawned by ___________ Scarborough.11 The court properly instructed the jury on the ___________ meaning of the phrase "in or affecting commerce." Smith also claims that the court should have required the jury to find a "substantial" effect on interstate commerce, in light of the Supreme Court's recent decision in United States v. Lopez, 115 S. Ct. 1624, 1629-30 _____________ _____ (1995). In Lopez, the Court struck down the Gun-Free School _____ Zones Act, 18 U.S.C. 922(q) (Supp. 1996), which prohibited a person from possessing a gun while in a "school zone," on the grounds that it exceeded Congress's powers under the Commerce Clause. Lopez, 115 S. Ct. at 1630-31. Smith _____ alleges that the Court's opinion in the Lopez case undermines _____ the proposition, stated in Scarborough and its progeny, that ___________ Congress intended nothing more than a minimal contact with interstate commerce. Consequently, Smith concludes that the district court committed error when it failed to instruct the jury that the government had the burden of proving that the ammunition at issue substantially affected interstate commerce.  ____________________ 11. United States v. Gillies, 851 F.2d 492, 494 (1st Cir.), _____________ _______ cert. denied, 488 U.S. 857 (1988); see also United States v. _____________ ________ _____________ Carter, 981 F.2d 645, 648 (2d Cir. 1992) (instruction that ______ "it is sufficient that the firearm allegedly possessed or received by defendant had at some point previously travelled across a state line" upheld in Section 922(g)(1) case), cert. _____ denied, 507 U.S. 1023 (1993).  ______ -27- 27 Smith's reliance on Lopez is misplaced. Unlike the _____ statute at issue in Lopez, Section 922(g)(1) (1976 & Supp. _____ 1996) contains a specific jurisdictional element which ensures, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. Where, as here, the jurisdictional element is present, the government need only prove the minimal nexus to interstate commerce identified in Scarborough. See Diaz-Martinez, 71 ___________ ___ _____________ F.3d at 953. Smith's argument is without merit. I. The Sufficiency of the Government's Evidence ____________________________________________ Smith argues that his conviction rests on insufficient evidence. In reviewing this claim, we must determine whether, after viewing the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the government's case, a rational factfinder could find, beyond a reasonable doubt, that the prosecution has proved the essential elements of the offense. United ______ States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). In so ______ _______ doing, this court defers to the jury as to all credibility judgments, and need conclude only that the evidence, taken in its entirety, supports a judgment of conviction. Id. ___ Because the evidence in this case was more than sufficient under this standard, Smith's claims are without merit. Smith argues that there was no evidence indicating that he possessed a handgun on the evening in question, hence -28- 28 no proof that he possessed ammunition as well. Smith points to the fact that, while Veneau and Tetreault both testified that the man in the back seat handed an object to Yanovitch and that the latter proceeded to shoot Viens, they did not go so far as to state that Smith passed a firearm to Yanovitch. However, the testimony of Veneau and Tetreault, together with the reasonable inferences that can be drawn therefrom and from the other evidence, is ample to establish Smith's involvement. Veneau said that he never saw Brian Smith with a gun, but that was because he did not know anyone named Brian Smith. Veneau's assertion that the man in the middle passed what Veneau believed to be a gun to Yanovitch, when coupled with evidence that Smith was the man in the middle, supports the conviction. Tetreault testified that she did not recognize the object while it was being passed to Yanovitch, but noted that she saw that it was a gun when Yanovitch got out of the car with it. This testimony, in conjunction with all the other evidence at hand, including the subsequent shooting and Duggan's testimony that he had seen Smith with a handgun earlier, was adequate to establish Smith's guilt beyond a reasonable doubt. J. Four-Level Increase in Smith's Guideline Sentencing ________________________________________________________ Range  ______ On appeal, Smith challenges the factual findings that served as the foundation for the four-level enhancement -29- 29 of his Guideline Sentencing Range ("GSR"). Since Smith's counsel properly objected to these findings at the sentencing hearing, this court's review is limited to clear error. United States v. Powell, 50 F.3d 94, 102-03 (1st Cir. 1995). ______________ ______ Under the circumstances, "we ask only whether the court clearly erred in finding that the government proved the disputed fact by a preponderance of the evidence." Id. at ___ 103. We hold that the factual findings were amply supported on the record and that the court did not commit clear error in assessing a four-level increase to Smith's GSR. Smith alleges that the district court clearly erred when it increased his GSR based upon its finding that he transferred the firearm to Yanovitch in connection with another felony offense. United States Sentencing Commission, Guidelines Manual, 2K2.1(b)(5) (Nov. 1995).12 Smith claims _________________ that the evidence presented at trial was insufficient, especially as there was an absence of proof that Smith knew that Yanovitch intended to use the gun to shoot Viens.  The evidence at trial was sufficient to show that Smith and Viens became involved in a dispute about a firearm at a Boston bar; that the two men left the bar together;  ____________________ 12. U.S.S.G. 2K2.1(b)(5) provides: "If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used in connection with another felony offense, increase by 4 levels . . . ." -30- 30 that, when Smith reached inside his jacket, Viens punched him; and that Smith was pulled into the back seat of the car, from where he handed a gun to Yanovitch, who proceeded to shoot Viens. From this, it was reasonable for the district court to infer that Smith gave his handgun to Yanovitch intending and expecting the latter to use it against Viens.13 As this was a reasonable and permissible interpretation, it justified the four-level enhancement of Smith's GSR. K. The Attachment of the Sentencing Hearing Transcripts to ________________________________________________________ Smith's Presentence Report __________________________ At the sentencing hearing, Smith asked the district court to order deleted from the PSR reference to certain state convictions. These convictions had been vacated prior to the hearing, and, as a result, Smith no longer could be sentenced as an armed career criminal, see 18 U.S.C.  ___ 924(e)(1) (Supp. 1996), although he could still be sentenced as a felon-in-possession. The district court stated on the record during the sentencing hearing that the challenged convictions had been set aside and ordered the transcript containing its remarks to be attached to the PSR as an indication that these convictions were no longer valid.  ____________________ 13. The district court held as follows: "I rule on the totality of the trial record . . . that the evidence is sufficient to warrant a finding that when Mr. Smith passed the weapon to Mr. Yanovitch, he well knew and he intended that it be used to assault Mr. Viennes [sic]. Not any self- defense, but in furtherance of the altercation. I find by a fair preponderance of the evidence that that was precisely what was in Mr. Smith's mind, and I add four levels . . . ."  -31- 31 Deeming attachment of the transcript to be an adequate corrective, the court refused to direct the probation officer to revise the PSR itself. Smith did not object to the court's procedure at the time, but on appeal complains that the Bureau of Prisons uses these PSRs to allocate the prison population among its institutions and programs. According to Smith, the Bureau's personnel is not likely to pay attention to the sentencing hearing transcript. Consequently, Smith argues that he has been unduly prejudiced by the district court's order. He asks us to order proper corrections to be made to his PSR. Federal Rule of Criminal Procedure 32(c)(1) requires a sentencing court to address each relevant matter in the PSR which is controverted by the parties.14 The court must make either a finding or a determination that none is necessary. Not intended as an "onerous" requirement, the sentencing court's determinations "can be simply entered onto a form which is then appended to the report." Advisory Committee Notes to Fed. R. Crim. P. 32(c)(3)(D) (the predecessor of Fed. R. Crim. P. 32(c)(1)), 1983 Amendments.  ____________________ 14. The relevant text of Rule 32(c)(1) is as follows: "For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing. A written record of these findings and determinations must be appended to any copy of the presentence report made available to the Bureau of Prisons." Fed. R. Crim. P. 32(c)(1). -32- 32 In United States v. Bruckman, 874 F.2d 57, 63-64 ______________ ________ (1st Cir. 1989), this court noted that the purpose behind the Rule's writing requirement is to protect the defendant's due process rights and to provide the reviewing court with a clear record of the disposition below. Smith does not here complain that the district court mishandled or misread the vacated convictions so as to sentence him improperly in this case. Rather, he fears that appending the transcript, rather than physically revising the PSR, is an insufficient way to alert future prison authorities to the true status of the prior convictions. Whether or not this is a realistic fear we cannot say. Smith did not raise this concern before the district judge, who was best situated to pass on it. Precedent indicates that the appending of a hearing transcript will comply with the Rule.15 If, in a particular case, there are practical reasons to do more, we have no doubt that the district court, if asked, would look into the matter, with the help of the probation officer. As we say, Smith did not raise the issue below; absent his having done so, we can find no error cognizable on appeal. We add that it is still not too late for Smith's concerns to be attended  ____________________ 15. See Bruckman, 874 F.2d at 65; see also United States v. ___ ________ ________ _____________ Santamaria, 788 F.2d 824, 829 (1st Cir. 1986) (citing United __________ ______ States v. Castillo-Roman, 774 F.2d 1280, 1285 (5th Cir. ______ ______________ 1985), for the proposition that appending the transcript of the sentencing court's determinations satisfied the requirements of the Rule). -33- 33 to administratively assuming they have any legitimacy, which we cannot ascertain from the record before us by simply appending a suitable notation to the PSR updating the status of the prior convictions. Whether this or some other measure is necessary we leave entirely to the appropriate authorities. L. Yanovitch's Sentence ____________________ Yanovitch challenges the factual findings made by the district court as a basis for his sentence. We review his claims for clear error. Powell, 50 F.3d at 102-03. We ______ are satisfied that the record below amply supports the sentencing court's factual findings and that Yanovitch's allegations are baseless. Yanovitch contends that the evidence at trial was insufficient to establish that he attempted to shoot Viens in the head, and that he had the intent to kill him. If anything, Yanovitch argues, the evidence at trial demonstrated that he acted in the heat of passion and in the absence of malice aforethought; there was no indication, according to Yanovitch, that he had the necessary state of mind for attempted murder. Nevertheless, the district court found that Yanovitch's conduct conformed to the charge of assault with intent to murder, and, based upon that finding, sentenced him under U.S.S.G. 2A2.1. On appeal, Yanovitch argues that a reasonable person would conclude that the -34- 34 incident in question was an aggravated assault or, at most, an assault with an attempt to commit manslaughter, either of which would require application of U.S.S.G. 2A2.2.16 Yanovitch's argument merits little discussion in light of the evidence at trial which was also summarized in his PSR, and the tape recording of Veneau's interview with Boston Police.17 This evidence obviously supports the sentencing court's determination that Yanovitch shot Viens with the intent to kill him. The court did not clearly err when it sentenced Yanovitch pursuant to U.S.S.G. 2A2.1. Affirmed. ________  ____________________ 16. While 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder) has a base offense level of 22, 2A2.2 (Aggravated Assault) has a base offense level of 15. 17. The PSR stated, in relevant part: "Yanovitch got out of the car, fired one round into the ground, then walked up to Viens and shot at Viens at least twice, striking him once in the abdomen and once in the upper thigh. Yanovitch then pursued Viens up the street, put the gun 2 to 3 feet from Viens' head, fired again, but missed." Veneau stated, in pertinent part: " . . . when I looking back I see Gerry Yanovitch 'bout three feet, two-and- half feet behind Bobby [Viens] pointing a, something that looks like a small calibre handgun towards Bobby's head, I hear another one, bang. There's five shots, all together I heard -- miss Bobby . . . ." -35- 35